EDWARD C. PRADO, Circuit Judge:
In 2004, an Iraqi insurgent group kidnapped and murdered twelve Nepali men as they traveled through Iraq to a United States military base to work for Daoud & Partners (“Daoud”), a Jordanian corporation that had a subcontract with Defendant-Appellee Kellogg Brown Root (“KBR”).[1] In 2008, the victims’ families, and one Daoud employee who was not captured (collectively “Plaintiffs”), sued Daoud and KBR. Plaintiffs alleged that the companies “willfully and purposefully formed an enterprise with the goal of procuring cheap labor and increasing profits,” and thereby engaged in human trafficking. Plaintiffs brought causes of action under the Alien Tort Statute (“ATS”), the Trafficking Victims Protection Reauthorization Act (“TVPRA”), and state common law. Although Plaintiffs settled with Daoud, they have continued their lawsuit against KBR, The district court, after nearly six years of motion practice and discovery, eventually dismissed all of Plaintiffs’ claims.
We hold that the district court’s grant of summary judgment on the ATS claims in favor of KBR was proper in light of the Supreme Court’s decision in Kiobel v. Royal Dutch Petroleum Co., — U.S. —, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), which held that the ATS did not apply extraterritorially. We also conclude that the district court correctly dismissed the TVPRA claims because (1) the TVPRA did not apply extraterritorially at the time of the alleged conduct in 2004 and (2) applying a 2008 amendment to the TVPRA that had the effect of permitting Plaintiffs’ extraterritorial claims would have an improper retroactive effect on KBR. Lastly, we hold that the district court did not abuse its discretion in dismissing the common law claims by refusing to equitably toll Plaintiffs’ state law tort claims. Accordingly, we AFFIRM.
I. BACKGROUND
A. Factual Background
Plaintiffs-Appellants in this case are Buddi Gurung (“Plaintiff Gurung”) and surviving family members of eleven deceased men (collectively, the “Deceased”). All Plaintiffs are citizens of Nepal.
In or around 2004, the Deceased were recruited to work by a Nepal-based recruiting company. As the district court found, “each man was promised a hotel related job in Jordan” and “each man’s family took on significant debt in order to pay recruitment fees.” The Deceased trav-elled from Nepal to Jordan where they were housed by a Jordanian job-brokerage company, Morning Star for Recruitment and Manpower Supply (“Morning Star”). Morning Star transferred the Deceased to Daoud. Daoud had a subcontract with KBR, a U.S. military contractor, to provide staff to operate the Al Asad Air Base (“Al Asad”), a U.S. military base north of Ramadi, Iraq.
While in Jordan, the Deceased “were subject to threats and harm,” “their passports were confiscated,” and they were “locked into a compound and threatened.” The Deceased were also told for the first time that they were actually being sent to Iraq to work on Al Asad and would be paid only three-quarters of what they were initially promised.
In August 2004, Daoud transported the Deceased into Iraq in an unprotected automobile caravan. The Deceased, however, never made it to the base. While traveling *191 through Iraq, they were captured by Iraqi insurgents. The insurgents posted online videos of the Deceased in which the Deceased said that they had been “trapped and deceived and sent to Jordan” and had been “forced ... to go to Iraq.” Horrifically, the Iraqi insurgents executed the Deceased, and a video of the executions was broadcast by international media outlets,
Plaintiff Gurung travelled in the same automobile caravan as the Deceased. He also had been recruited to work in Nepal and had travelled to Jordan, but the car he was in was not captured and he arrived at Al Asad. Plaintiff Gurung worked on the base as a “warehouse loader/unloader” for approximately fifteen months. Plaintiff Gu-rung alleged that Daoud and KBR told him that “he could not leave until his work in Iraq was complete.”
B. Procedural Background
In 2008, Plaintiffs filed suit against KBR and Daoud. They asserted claims under the TVPRA and the ATS, and also brought common law negligence claims.[2] In November 2009, the district court granted KBR’s motion to dismiss Plaintiffs’ common law negligence claims. It held that these claims were barred by the statute of limitations and denied Plaintiffs’ request for equitable tolling. However, the court denied KBR’s motion as to Plaintiffs’ TVPRA and ATS claims.
In August 2013, the district court granted in part and denied in part KBR’s motion for summary judgment. It dismissed Plaintiffs’ ATS claims against KBR in light of the Supreme Court’s intervening decision in Kiobel. In Kiobel, the Supreme Court held that the presumption against extraterritoriality applies to ATS claims and nothing in the statute rebuts the presumption. 133 S.Ct. at 1669. The district court held that Kiobel compelled dismissal of the ATS claims because “all relevant conduct by Daoud and KBR occurred outside of the United States.” The court denied KBR’s motion for summary judgment on the TVPRA claim, noting that the law was “expressly extraterritorial” under 18 U.S.C. § 1596.
KBR moved for interlocutory review of the district court’s TVPRA ruling under 28 U.S.C. § 1292(b). In response, the district court reconsidered its denial of summary judgment sua sponte on the TVPRA claim. The court reversed its previous decisions and held that the TVPRA — like the ATS— did not apply extraterritorially at the time of the alleged conduct in 2004. It explained that although Congress passed an amendment in 2008 that provided federal courts with jurisdiction over purely extraterritorial TVPRA civil claims, see Pub. L. No. 110-457, § 223(a), 122 Stat. 5044 (2008) (codified at 18 U.S.C. § 1596(a)), this amendment had the effect of altering the parties’ substantive rights and, as a result, could not be applied retroactively to KBR’s alleged 2004 conduct.
Plaintiffs responded by filing motions for rehearing on the district court’s TVPRA and ATS rulings and for leave to amend their ATS claims. In March 2015, the district court denied these motions. This appeal followed.
II. DISCUSSION
Plaintiffs argue that we should allow their ATS, TVPRA, and common law tort claims to proceed. We address each claim in turn.
*192 A. The ATS Claims
The district court dismissed the ATS claims at summary judgment. We review a grant of summary judgment de novo. RTM Media, LLC v. City of Houston, 584 F.3d 220, 223 (5th Cir. 2009). “Summary judgment is proper when the evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Id. (quoting Chacko v. Sabre, Inc., 473 F.3d 604, 609 (5th Cir. 2006)).
“The ATS provides, in full, that ‘[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.’ ” Kiobel, 133 S.Ct. at 1663 (quoting 28 U.S.C. § 1350). Although the statute “provides district courts with jurisdiction to hear certain claims,” it “does not expressly provide any causes of action.” Id. Rather, the ATS provides jurisdiction for a “modest number of international law violations” that are derived from federal common law. Id, (quoting Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 124 S.Ct. 2739,159 L.Ed.2d 718 (2004)). To be cognizable, a plaintiffs claims must be stated “with the requisite definite content and acceptance among civilized nations.” Doe v. Drummond Co., 782 F.3d 576, 583 (11th Cir. 2015) (quoting Kiobel, 133 S.Ct. at 1663), cert. denied, — U.S. —, 136 S.Ct. 1168,194 L.Ed.2d 178 (2016).
Plaintiffs contend that KBR’s alleged involvement in the trafficking of the Deceased and Plaintiff Gurung and in the forced labor of Plaintiff Gurung at Al Asad constitute actionable torts under the ATS. KBR counters that Plaintiffs’ allegations of misconduct in foreign countries are barred by the presumption against extraterritoriality.

1, The Presumption Against Extraterritoriality

The presumption against extraterritoriality is a canon of statutory interpretation rooted in the “longstanding principle” that a federal statute “is meant to apply only within the territorial jurisdiction of the United States” absent congressional intent to the contrary. Morrison v. Nat’l Austl. Bank Ltd., 561 U.S. 247, 255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)). “When a statute gives no clear indication of an extraterritorial application, it has none.” Id.
A two-step inquiry governs the presumption’s application to a statute. RJR Nabisco, Inc. v. European Cmty., — U.S. —, 136 S.Ct. 2090, 2101,195 L.Ed.2d 476 (2016). First, “we ask whether the presumption against extraterritoriality has been rebutted — that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially.” Id. Second, “[i]f the statute is not extraterritorial, then ... we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute’s ‘focus.’ ” Id.
Step two’s “focus” inquiry is derived from the Supreme Court’s decision in Morrison. See 561 U.S. at 255, 130 S.Ct. 2869. As the Supreme Court explained, whether the presumption bars a claim is not always “self-evidently dispositive” because cases will often have some “contact with the territory of the United States.” Id. at 266, 130 S.Ct. 2869. In Morrison, the plaintiffs had brought suit under § 10(b) of the Securities Exchange Act of 1934 (“Exchange Act”) based on alleged misrepresentations made in connection with the sales and purchases of securities registered on foreign exchanges. Id. at 250-53, 130 S.Ct. *193 2869. Some of these misrepresentations occurred in the United States. Id. After holding the presumption against extraterritoriality applied to § 10(b), id. at 265, 130 S.Ct. 2869, the Court “engaged in a separate inquiry to determine whether the complaint ... involved a permissible domestic application of § 10(b) because it alleged that some of the relevant misrepresentations were made in the United States.” RJR Nabisco, 136 S.Ct. at 2100. The Court’s separate inquiry considered the statute’s “focus.” Id.-, Morrison, 561 U.S. at 266, 130 S.Ct. 2869. The Court ruled that the Exchange Act’s “focus” was “not upon the place where the deception originated, but upon purchases and sales of securities in the United States.” Morrison, 561 U.S. at 266, 130 S.Ct. 2869. It concluded that because the statute was focused on domestic securities transactions, the plaintiffs’ alleged domestic activity — the misrepresentations — made in connection with a foreign transaction failed to show a permissible domestic application of the statute. See id. at 267, 130 S.Ct. 2869; RJR Nabisco, 136 S.Ct. at 2100.
As for the ATS, the Supreme Court in Kiobel addressed step one of the extraterritoriality inquiry: the Court held that the “presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption.” 133 S.Ct. at 1669. In that case, Nigerian nationals sued Dutch, British, and Nigerian corporations, alleging that they aided and abetted the Nigerian military in committing international law violations in Nigeria. Id. at 1662. The Court held that the ATS did not confer jurisdiction because “all the relevant conduct took place outside the United States.”[3] Id. at 1669. Although the Court found that the presumption precluded the plaintiffs’ claims “[o]n these facts,” it did not foreclose the possibility that there may be circumstances in which the bar would not apply. Id. The Court stated that the ATS could create jurisdiction for “claims [that] touch and concern the territory of the United States ... with sufficient force to displace the presumption against extraterritorial application.” Id. (citing Morrison, 561 U.S. at 265-73, 130 S.Ct. 2869). Notably, in discussing claims that “touch and concern” the United States, the Court cited to Morrison and its “focus” inquiry. See Kiobel, 133 S.Ct. at 1669 (citing Morrison, 561 U.S. at 265-73,130 S.Ct. 2869).
On appeal, the parties dispute the meaning of Kiobel’s “touch and concern” language, including how to reconcile it with Morrison’s “focus” inquiry. Plaintiffs, along with amici curiae, suggest that Kio-bel provided an ATS-specific test that largely supplants Morrison’s “focus” analysis. In support, Plaintiffs point to the Fourth Circuit’s decision in Al Shimari v. CACI Premier Tech, Inc., 758 F.3d 516 (4th Cir. 2014), one of the first decisions to analyze Kiobel’s “touch and concern” language. In Al Shimari, the court observed that “the ‘claims,’ rather than the alleged tortious conduct, must touch and concern United States territory with sufficient force, suggesting that courts must consider *194 all the facts that give rise to ATS claims, including the parties’ identities and their relationship to the causes of action.” Id. at 527 (quoting Kiobel, 133 S.Ct. at 1669). Plaintiffs contend that Kiobel mandates a fact-specific analysis that looks to “the totality of [their] claim’s connection to U.S. territory and the national interest.”
KBR responds that RJR Nabisco makes clear that Morrison’s “focus” test still governs. We agree. In RJR Nabisco, the Supreme Court observed that both “Morrison and Kiobel reflect a two-step framework for analyzing extraterritoriality issues.” 136 S.Ct. at 2101. As the Court clarified, Kiobel did not reach step two— i.e., the Court “did not need to determine, as [it] did in Morrison, the statute’s ‘focus’ ” — because “ ‘all the relevant conduct’ regarding” the alleged international-law violations occurred overseas. Id. (quoting Kiobel, 133 S.Ct. at 1670). In other words, the Court in Kiobel did not disclaim the focus inquiry for ATS claims. It simply pretermitted the issue. See Balintulo v. Daimler AG, 727 F.3d 174, 191 (2d Cir. 2013) (“[S]ince all the relevant conduct in Kiobel occurred outside the United States — a dispositive fact in light of the Supreme Court’s holding — the Court had no reason to explore, much less explain, how courts should proceed when some of the relevant conduct occurs in the United States.”).
Therefore, if an ATS claim involves some domestic activity relevant to the claim, “further analysis” is required. Morrison, 561 U.S. at 266, 130 S.Ct. 2869; accord RJR Nabisco, 136 S.Ct. at 2100. This analysis — step two of the extraterritoriality inquiry — requires looking to the ATS’s focus, which resolves whether the claims “touch and concern” the United States territory with “sufficient force” such that the presumption against extraterritoriality is displaced. Kiobel, 133 S.Ct. at 1669; see also Mastafa v. Chevron Corp., 770 F.3d 170, 182 (2d Cir. 2014) (“An evaluation of the presumption’s application to a particular case is essentially an inquiry into whether the domestic contacts are sufficient to avoid triggering the presumption at all.”).
Step two, however, requires distinguishing between conduct underlying the plaintiffs claim — i.e., cause of action— from conduct relevant to the statute’s focus. Only conduct relevant to the statute’s focus determines domestic application of the statute. See Morrison, 561 U.S. at 266, 130 S.Ct. 2869. Thus, for ATS claims, “[i]f the conduct relevant to the [ATS’s] focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad.” RJR Nabisco, 136 S.Ct. at 2101. But “if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.” Id.
We note that other circuits have offered differing interpretations of Kiobel’s “touch and concern” language, including to what extent it adopts Morrison’s “focus” inquiry. The Ninth Circuit has explicitly held that Kiobel “did not incorporate Morrison’s focus test,” Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1028 (9th Cir. 2014), although the eight judges that dissented from denial of rehearing en banc disagreed, see Doe I v. Nestle USA, Inc., 788 F.3d 946, 953 (9th Cir. 2015) (Bea, J., dissenting). By contrast, the Second Circuit has held that Morrison controlled its ATS analysis by requiring courts to evaluate “the ‘territorial event[s]’ or ‘relationship[s]’ that were the ‘focus’ of the ATS.” Mastafa, 770 F.3d at 184 (quoting Morrison, 561 U.S. at 266, 130 S.Ct. 2869). The Eleventh Circuit has adopted a hybrid ap *195 proach: it “amalgamate[d] Kiobel’s standards with Morrison’s focus test, considering whether ‘the claim’ and ‘relevant conduct’ are sufficiently ‘focused’ in the United States to warrant displacement and permit jurisdiction.” Doe v. Drummond, 782 F.3d at 590 (quoting Baloco v. Drummond Co., 767 F.3d 1229, 1238-39 (11th Cir. 2014)), cert. denied, — U.S. —, 136 S.Ct. 1168, 194 L.Ed.2d 178 (2016).
We have not yet entered the jurisprudential fray surrounding Kiobel. Nevertheless, we conclude that the Supreme Court’s guidance in RJR Nabisco — --which was issued after the foregoing circuit court opinions — is determinative and, in turn, apply RJR Nabisco’s two-step framework. See 136 S.Ct. at 2101. As explained further below, our approach largely comports with the Second Circuit’s “ATS ‘focus’ analysis” to the extent it involves “examining the conduct alleged to constitute violations of the law of nations, and the location of that conduct.” Mastafa, 770 F.3d at 185.

2. Application of the Two-Step Framework

We turn to applying the two-step framework where, as here, the ATS claims involve extraterritorial conduct. Kiobel answered step one: the ATS does not apply extraterritorially. Thus, under step two, we must determine whether Plaintiffs have sought a domestic application of the statute. We first look to whether there is any domestic conduct relevant to Plaintiffs’ claims under the ATS. If we conclude that the record is devoid of any domestic activity relevant to Plaintiffs’ claims, our analysis is complete: as in Kiobel, the presumption against extraterritoriality bars the action. See Kiobel, 133 S.Ct. at 1669; RJR Nabisco, 136 S.Ct. at 2101.
Plaintiffs allege that KBR violated international law by engaging in a scheme to traffic Plaintiffs and to subject them to forced labor on Al Asad. As for the claim regarding the Deceased, the recruitment, transportation, and alleged detention by Daoud and Morning Star all occurred in Nepal, Jordan, and Iraq. The Deceased never arrived at Al Asad. Thus, none of this overseas conduct relevant to their trafficking claim — even assuming without deciding that it can be imputed to KBR— could support the conclusion that Plaintiffs seek to apply the ATS domestically.
Plaintiffs further contend that the district court had jurisdiction under the ATS in light of KBR’s conduct (1) on Al Asad and (2) within the United States, which Plaintiffs argue is sufficient to displace the presumption against extraterritoriality.

a. Al Asad

Plaintiffs argue that Al Asad was under the jurisdiction and control of the United States and that, as a result, KBR’s actions on the base constitute domestic conduct for purposes of their ATS claims. In particular, they claim that KBR’s conduct on Al Asad was integral to Plaintiff Gurung’s claim that he was subject to forced labor during the fifteen months he worked on the base. They also contend that KBR’s conduct at Al Asad is relevant to the claim that the Deceased were victims of human trafficking. Notably, the district court found that Plaintiffs had presented a genuine dispute of material fact whether KBR “knowingly obtained trafficked labor during the relevant time period,” although it concluded that evidence pointed only to KBR’s Al Asad operations.
In deciding whether KBR’s conduct on AI Asad constitutes domestic conduct, we first address how to distinguish between domestic and foreign conduct for purposes of the presumption against extraterritori *196 ality.[4] KBR contends that the question is a matter of de jure sovereignty, arguing that “Iraq’s retention of de jure sovereignty over Al Asad defeats characterizing it as U.S. territory.” See Coalition Provisional Authority Order No. 17 (Revised) § 9 (noting that any premises operated by the Multinational Forces in Iraq “remain Iraqi territory”). KBR’s assertion is not without support in recent Supreme Court case law. In Kiobel, the Court held that the issue was whether a claim under the ATS “may reach conduct occurring in the territory of a foreign sovereign.” 133 S.Ct. at 1664 (emphasis added). RJR Nabisco also suggests that domestic conduct is that which “occurred in the United States” rather than “in a foreign country.” 136 S.Ct. at 2101. Nevertheless, the Supreme Court in Kiobel and RJR Nabisco did not squarely address whether what constitutes the United States also encapsulates its de fac-to territory.
Plaintiffs counter by citing to the Supreme Court’s decision in Rasul v. Bush, 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), which suggests a functional inquiry may be applicable. In Rasul, the Court addressed whether the federal habe-as statute, 28 U.S.C. § 2241, applied to persons detained at the United States Naval Base at Guantanamo Bay, Cuba. Id. at 470-75, 124 S.Ct. 2686. The Court explained that “[w]hatever traction the presumption against extraterritoriality might have in other contexts, it certainly has no application to the operation of the habeas statute with respect to persons detained within ‘the territorial jurisdiction’ of the United States.” Id. at 480, 124 S.Ct. 2686 (quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). In coming to this conclusion, the Court highlighted that the “United States exercise[d] ‘complete jurisdiction and control’ over the Guantanamo Bay Naval Base, and may continue to exercise such control permanently if it so chooses.” Id. (quoting Treaty Between the United States of America and Cuba, art. 3, May 29, 1934). However, the Court also noted its conclusion was supported by the Government’s concession that the habeas statute “would create federal-court jurisdiction over the claims of an American citizen held at the base.” Id. at 481, 124 S.Ct. 2686.
At least one court has observed that Rasul’s holding is essentially limited to the habeas context. See Marshall v. Exelis Sys. Corp., No. 13-CV-00545, 2014 WL 1213473, at *7 (D. Colo. Mar. 24, 2014).[5] Regardless, we need not resolve to *197 what extent Rasul’s reasoning extends beyond the habeas context for purposes of the presumption against extraterritoriality. Assuming arguendo that it applies here, Plaintiffs have failed to establish that the United States controlled Al Asad in 2004 such that it constituted the territory of the United States. As other courts have found, a U.S. military base does not constitute de facto territory where “the United States has not demonstrated intent to exercise sovereignty over” that base permanently. Marshall, 2014 WL 1213473, at *6; Al Maqaleh v. Gates, 605 F.3d 84, 97 (D.C. Cir. 2010) (rejecting “the notion that [the United States’] de facto sovereignty extends to” Bagram Airfield in Afghanistan where “there is no indication of any intent to occupy the base with permanence”). Here, in contrast with the Guantanamo Bay Naval Base — over which the United States had “unchallenged and indefinite control,” Rasul, 542 U.S. at 487, 124 S.Ct. 2686 (Kennedy, J., concurring) — the United States’ use of Al Asad had only begun in 2003, one year before the conduct at issue. Further, it lasted until only 2011. On this record, we are unconvinced that Al Asad constituted de facto territory of the United States in 2004. Consequently, because KBR’s actions at Al Asad occurred in Iraq and not the United States, those actions cannot constitute domestic conduct relevant to their ATS claims.

b. U.S.-Based Conduct

Plaintiffs also argue that U.S.based conduct rebuts the presumption against extraterritoriality. First, they cite KBR’s domestic payments to Daoud, the subcontractor that hired the Deceased and Plaintiff Gurung. Second, they claim that employees based in Houston, Texas, were “aware of allegations of human trafficking at [KBR’s] worksites.”
Whether Plaintiffs seek a domestic application of the statute is determined by the location of the conduct relevant to the ATS’s focus. See RJR Nabisco, 136 S.Ct. at 2101. Thus, we ask what the “ ‘focus’ of congressional concern” is with the ATS. Morrison, 561 U.S. at 266, 130 S.Ct. 2869. We agree with the district court that the ATS’s focus is the “tort ... committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. That is, the focus is conduct that violates international law, which the ATS “seeks to ‘regulate’ ” by giving federal courts jurisdiction over such claims. Morrison, 561 U.S. at 267, 130 S.Ct. 2869. And if that conduct “occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.” RJR Nabisco, 136 S.Ct. at 2101; see also Mastafa, 770 F.3d at 185 (noting that the “ATS ‘focus’ analysis” requires “examining the conduct alleged to constitute violations of the law of nations, and the location of that conduct”); Doe v. Drummond, 782 F.3d at 592 (“[0]ur jurisdictional inquiry requires us to consider the domestic or extraterritorial location where the defendant is alleged to engage in conduct that directly or secondarily results in violations of international law within the meaning of the ATS.”).
Plaintiffs allege that KBR was directly liable for the tort of human trafficking and forced labor. However, all the conduct comprising the alleged international law violations occurred in a foreign country. As the district court explained, “Plaintiffs can no more pursue an ATS claim against KBR based on those extraterritorial ae- *198 tions than they can pursue an ATS claim against Daoud.”
Plaintiffs have failed to show how KBR’s alleged financial transactions permit a domestic application of the ATS. They contend that KBR “transferred payments to [Daoud] from the United States, using New York Banks.” However, they failed to connect the alleged international law violations to these payments or demonstrate how such payments — by themselves — demonstrate that KBR’s U.S.-based employees actually engaged in trafficking the Deceased or forcing Plaintiff Gurung to work on its base. See Mastafa, 770 F.3d at 185 (citing Balintulo, 727 F.3d at 192 (holding that the plaintiffs’ “allegations were insufficient to displace the presumption” against extraterritoriality where “defendants’ alleged domestic conduct lacked a clear link to the human rights abuses occurring in South Africa that were at the heart of plaintiffs’ action”)).
Further, Plaintiffs’ contention that KBR’s U.S.-based employees may have known about “allegations” of human rights abuse by Daoud or KBR overseas is not enough to raise a genuine fact dispute that those employees were directly liable for violating international law. In response to Plaintiffs’ motion for reconsideration of its ruling, the district court acknowledged that Plaintiffs had introduced some evidence suggesting KBR knew it obtained trafficked labor. However, it noted that such evidence only implicated KBR’s operations overseas. Plaintiffs had failed to introduce any evidence indicating that KBR’s U.S.-based employees either (1) “understood the circumstances surrounding Daoud’s ‘recruitment’ and ‘supply’ of third-country nationals like Plaintiffs” or (2) “worked to prevent those circumstances from coming to light or Daoud’s practices from being discontinued.” Further, Plaintiffs effectively concede this point: in reference to the district court’s reasoning that U.S.-based employees did not “cover up” human trafficking, they argue they “would have specifically alleged such conduct by U.S.-based KBR employees” had they been permitted to amend their complaint.
Lastly, we find Plaintiffs’ alternative arguments unpersuasive. They note that the Supreme Court in Kiobel reasoned the presumption against extraterritoriality serves to protect against “international discord” that could result if U.S. law governed overseas. Kiobel, 133 S.Ct. at 1661 (citing Arabian Am. Oil Co., 499 U.S. at 248, 111 S.Ct. 1227). Relying on this language, Plaintiffs argue that Kiobel established the inverse rule: the presumption does not apply in cases where entertaining the ATS claim would not “negatively impact[] U.S. foreign policy.” They further contend that refusing to apply the presumption here would promote U.S. foreign policy because it would enable Plaintiffs to hold a military contractor such as KBR liable for conduct on a U.S. military base. Relatedly, Plaintiffs argue that their claims are distinguishable from those at issue in Kiobel because the prohibition against human trafficking is “unique[] among international human rights norms” insofar as it “involves extraterritorial conduct.”
However, “[t]hese case-specific policy arguments miss the mark.” Balintulo, 727 F.3d at 191. The foreign-policy consequences and the international norms underlying the claim are immaterial to our analysis. “The canon against extraterritorial application is ‘a presumption about a statute’s meaning.”’ Id. (quoting Morrison, 561 U.S. at 255, 130 S.Ct. 2869) (emphasis in original). Thus, its applicability does not depend on “whether we think ‘Congress would have wanted’ a statute to apply to foreign conduct ‘if it had thought *199 of the situation before the court.’” RJR Nabisco, 136 S.Ct. at 2100 (quoting Morrison, 561 U.S. at 261, 130 S.Ct. 2869). The presumption applies “across the board, ‘regardless of whether there is a risk of conflict between the American statute and a foreign law.’ ” Id. (quoting Morrison, 561 U.S. at 255, 130 S.Ct. 2869). “Rather than guess anew in each case” as Plaintiffs urge, “we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects.” See Morrison, 561 U.S. at 261, 130 S.Ct. 2869 (emphasis added). The Supreme Court in Kiobel held that the presumption applied to the ATS. That ruling binds us in all cases.

3. Leave to Amend

Plaintiffs contend that they should have been permitted to amend their complaint to allege aiding and abetting in the United States in light of Kiobel. The district court denied this request. “[W]here, as here, the district court’s denial of leave to amend was based solely on futility, we apply a de novo standard of review identical, in practice, to the standard used for reviewing a dismissal under Rule 12(b)(6).” City of Clinton v. Pilgrim’s Pride Corp., 632 F.3d 148, 152 (5th Cir. 2010). In denying Plaintiffs’ request, the district court explained that its “decision was based on the summary judgment record, not on the pleadings.” The district court noted that because Plaintiffs failed to identify any evidence which was not or could not have been presented to the court prior to its ruling, amendment in this case would be futile.
Plaintiffs on appeal argue that granting leave to amend would comport with the decisions of other courts after Kiobel which have allowed plaintiffs to add allegations that might displace the presumption against extraterritoriality. Plaintiffs state they “will be able to allege that U.S.-based managers knew they were obtaining trafficked labor, and continued to do so despite this knowledge.” Additionally, Plaintiffs assert that they “will be able to allege the same facts found sufficient in Al Shi-mari.” In particular, they claim that they will point to (1) KBR’s U.S. corporate citizenship; (2) the U.S. citizenship of the responsible KBR employees; (3) the existence of a contract between KBR and the U.S. government; (4) KBR’s U.S.-based managers’ approval and cover-up of misconduct; and (5) the express intent of Congress.
We affirm the district court’s decision to deny leave to amend. As an initial matter, an aiding and abetting theory of liability was not presented to the district court. Counsel for Plaintiffs reiterated at oral argument that they believed aiding and abetting was already a theory within the original complaint, but were seeking to add allegations that would more specifically satisfy Kiobel’s “touch and concern” test in light of emerging case law. However, while the “touch and concern” test may have been unsettled after Kiobel, Plaintiffs had already presented the evidence and made the allegations that supported their argument in favor of displacing the presumption against extraterritoriality.[6] Plaintiffs argue they would be able to allege facts that satisfy Al Shimari, but Al Shimari is not the test. As we have discussed, our approach requires analysis of the conduct relevant to the statute’s “focus.” See Morrison, 561 U.S. at 266, 130 S.Ct. 2869. Plaintiffs essentially seek to plead the same allegations that this Court has found *200 insufficient to displace the presumption against extraterritoriality. Amendment would bring Plaintiffs no closer to satisfying the test articulated in Morrison and in RJR Nabisco. Accordingly, amendment would be futile.
B. The TVPRA Claim
Plaintiffs alleged that KBR’s actions violated the TVPRA, 18 U.S.C. §§ 1589,1590, which prohibits forced labor and human trafficking, respectively. In their first amended complaint, Plaintiffs cited 18 U.S.C. § 1595, the TVPRA’s civil-remedy provision, which Congress first enacted in 2003. See Pub. L. No. 108-193, 117 Stat. 2878 (2003). Section 1595 permits suits by private parties for violations of, inter alia, § 1589 or § 1590. After Plaintiffs filed their first amended complaint, 18 U.S.C. § 1596 became law. See Pub. L. No. 110-457, § 223(a), 122 Stat. 5044 (2008) (codified at 18 U.S.C. § 1596(a)). This provision, entitled “Additional jurisdiction in certain trafficking offenses,” provides:
In addition to any domestic or extraterritorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—
(1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or
(2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.
18 U.S.C. § 1596(a) (the “2008 Amendment”).
The parties do not dispute that the 2008 Amendment enables federal courts to entertain a private party’s civil suit that alleges extraterritorial violations of the TVPRA. See Kiobel, 133 S.Ct. at 1665 (“Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad.”). However, because the TVPRA, unlike the ATS, is extraterritorial in scope, Plaintiffs argue that their TVPRA claims are viable under a different theory than the ATS claims. They argue that § 1596— which explicitly rebuts the presumption against extraterritoriality — applies to their pending lawsuit.
However, in seeking to apply § 1596 to pre-enactment conduct, Plaintiffs confront a different canon of statutory interpretation: the presumption against retroactivity. This “presumption against retroactive legislation ... is deeply rooted in our jurisprudence.” Margolies v. Deason, 464 F.3d 547, 551 (5th Cir. 2006) (quoting Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 946, 117 S.Ct. 1871,138 L.Ed.2d 135 (1997)).
Plaintiffs make two distinct arguments as to why the presumption against retroac-tivity does not prevent applying § 1596 to their pending lawsuit. First, they claim that § 1596 did not alter the law. Rather, it clarified Congress’s intent to allow a civil remedy for extraterritorial violations of the TVPRA. Because the 2008 Amendment merely clarified a meaning extant in the TVPRA at the time of the alleged conduct, it applies to their case. See, e.g., Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1283 (11th Cir. 1999) (“[Concerns about retroactive application are not implicated when an amendment that takes effect after the initiation of a lawsuit is deemed to clarify ... rather than effect a substantive change in the law.”); Liquilux Gas Corp. v. Martin Gas Sales, 979 F.2d 887, 890 (1st Cir. 1992) (finding it “need not determine” the retroactivity issue be *201 cause the amendment at issue merely clarified existing law). Second, Plaintiffs claim that even if § 1596 was not merely clarifying, it nonetheless applies to KBR’s alleged pre-enactment conduct because it is a purely jurisdictional statute that speaks only to the power of the court rather than the parties’ substantive rights. We address each argument in turn.

1. Extraterritoriality Prior to the 2008 Amendment

Plaintiffs argue that the 2008 Amendment clarified rather than changed the TVPRA and therefore should apply to their lawsuit. We have observed that “changes in statutory language” do not always “constitute a change in meaning or effect” of that statute. NCNB Tex. Nat’l Bank v. Cowden, 895 F.2d 1488, 1500 (5th Cir. 1990) (quoting United States v. Montgomery Cty., 761 F.2d 998, 1003 (4th Cir. 1985)). Rather, Congress may amend a law merely “to make what was intended all along even more unmistakably clear.” Id. (quoting Montgomery Cty., 761 F.2d at 1003).
Several factors inform whether a statutory amendment merely clarifies the law rather than effects a substantive change. For instance, courts consider: (1) “whether the enacting body declared that it was clarifying a prior enactment”; (2) “whether a conflict or ambiguity existed prior to the amendment”; and (3) “whether the amendment is consistent with a reasonable interpretation of the prior enactment.” United States ex rel. Garbe v. Kmart Corp., 824 F.3d 632, 642 (7th Cir. 2016) (quoting Middleton v. City of Chicago, 578 F.3d 655, 663-64 (7th Cir. 2009)); see also FDIC v. Belli, 981 F.2d 838, 841 (5th Cir. 1993).
We begin with the original act — the civil-remedy provision, 18 U.S.C. § 1595— and conclude that it was not ambiguous. At the time Congress added á civil remedy in 2003, the law regarding extraterritoriality was clear: it was “assume[d] that Congress legislates against the backdrop of the presumption against extraterritoriality.” Arabian Am. Oil Co., 499 U.S. at 248, 111 S.Ct. 1227. Thus, a law was presumed not to apply extraterritorially absent “the affirmative intention of the Congress clearly expressed.” Id. (quoting Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147, 77 S.Ct. 699,1 L.Ed.2d 709 (1957)).
Notably, other provisions of the TVPRA expressly contemplated overseas endeavors, such as § 107, which established “initiatives in foreign countries to assist ... victims of human trafficking.” Trafficking Victims Protection Act, Pub. L. No. 106-386, § 107(a) (2000) (codified at 22 U.S.C. § 7105). However, there is no express indication of extraterritorial application in the private cause-of-action provision, § 1595, or its substantive prohibitions, §§ 1589 and 1590. Rather, the pre-2008 TVPRA was silent on whether the civil remedy applies extraterritorially. In light of'the well-established presumption against extraterritoriality, we conclude that § 1595 unambiguously did not apply extraterrito-rially until § 1596 was enacted.
Further, nothing in the text of § 1596 expressly indicates that Congress intended to clarify rather than change the TVPRA. See Middleton, 578 F.3d at 664; Belli, 981 F.2d at 841. Rather, as the provision’s title indicates; it provided “[additional jurisdiction.” [7] Indeed, the two courts to address *202 TVPRA’s civil remedy provision before 2008 held that the law did not provide a cause of action for extraterritorial conduct. See Nattah v. Bush, 541 F.Supp.2d 223, 234 (D.D.C. 2008), aff'd in part, rev’d in part on other grounds, 605 F.3d 1052 (D.C. Cir. 2010); John Roe I v. Bridgestone Corp., 492 F.Supp.2d 988, 999-1004 (S.D. Ind. 2007). As such, in contrast to cases where this Court has held an amendment was clarifying, there was no circuit split or conflict that “provoked” Congress to “enact an amendment to clarify rather than change the law.” Cowden, 895 F.2d at 1501.
Plaintiffs’ only argument is non-textual circumstantial evidence: the 2008 Amendment “was passed promptly after cases questioning the TVPRA’s extraterritorial application” — specifically, the district court decisions in Nattah and John Roe I. We may consider the circumstances surrounding the enactment to determine whether it was clarifying. See Laubie v. Sonesta Int’l Hotel Corp., 752 F.2d 165, 168 (5th Cir. 1985).
However, in this case, we find Plaintiffs’ theory of temporal proximity unavailing. The question is whether, in passing § 1596, Congress “merely intended to clarify what it had meant all along” in the TVPRA’s civil-remedy provision. Belli, 981 F.2d at 840. Nothing in the text of the pre-2008 TVPRA or in the text of § 1596 indicates that a plaintiff was allowed to sue for extraterritorial violations of the TVPRA before 2008.
Further, we find Laubie, the case relied on by Plaintiffs, distinguishable. In that case, this Court held that a Louisiana state law was clarifying based on the “the timing of the amendment ] and its language.” Laubie, 752 F.2d at 168. Here, the language indicates that the 2008 Amendment is not clarifying. In contrast to Laubie, Plaintiffs’ only evidence is timing. But it is not evident that the temporal proximity between the two district court rulings and § 1596’s enactment — by itself — supports their claim. It is equally plausible to infer based on timing alone that Congress amended the TVPRA to provide a civil remedy for extraterritorial violations because it had concluded none previously existed. Indeed, a district court recently made just that inference. See St. Louis v. Perlitz, No. 3:13-CV-1132, 2016 WL 1408076, at *2 (D. Conn. Apr. 8, 2016) (“That Congress added [§ 1596,] a new provision explicitly giving extraterritorial effect to § 1591[, the TVPRA’s prohibition on sex trafficking,] further supports the conclusion” that the law did not apply ex-traterritorially before the amendment.). Such lack of clarity regarding Plaintiffs’ evidence of timing is precisely why we have admonished that “reliance on subsequent legislative actions to determine the meaning of an earlier statute is hazardous.” Cowden, 895 F.2d at 1500. Accordingly, given that nothing in the text of the TVPRA either in 2004 or today indicates that Plaintiffs could assert a civil remedy for extraterritorial violations before § 1596 was enacted, the amendment’s timing fails to persuade us that the law was a clarifying amendment.

2. The 2008 Amendment’s Retroactive Effect

The district court also held that the presumption against retroactivity pre *203 vents applying § 1596 to KBR’s pre-enactment conduct, reasoning that the law was not merely jurisdictional. The presumption against retroactivity “is based on ‘the unfairness of imposing new burdens on persons after the fact.’” Hartford Cas. Ins. Co. v. FDIC, 21 F.3d 696, 700 (5th Cir. 1994) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). The Supreme Court’s decision in Landgraf v. USI Film Products provides the two-step framework for addressing retroactivity questions.
First, we consider “whether Congress has expressly prescribed the statute’s proper reach.” Landgraf, 511 U.S. at 280, 114 S.Ct. 1483. If Congress has addressed the issue, a court need not rely on the “judicial default rules.” Id. But if “the statute contains no such express command, the court must determine whether the new statute would have retroactive effect.” Id. A statute, however, does not have a retroactive effect “merely because it is applied in a case arising from conduct antedating the statute’s enactment ... or upsets expectations based in prior law.” Id. at 269, 114 S.Ct. 1483 (internal citation omitted). Rather, a retroactive effect is present when that statute “would impair rights a party possessed when he acted, increase a party’s liability for past conduct, or impose new duties with respect to transactions already completed.” Id. at 280, 114 S.Ct. 1483. “If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.” Id.
However, there are situations where a court must “apply the law in effect at the time it renders its decision.” Id. at 273, 114 S.Ct. 1483 (quoting Bradley v. Sch. Bd. of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 2006). “Such situations generally involve procedural changes to existing law, including statutes which merely alter jurisdiction.” Hartford Cas. Ins., 21 F.3d at 700. Jurisdiction-altering rules “usually” do not have retroactive effect because such rules “take[] away no substantive right but simply change[ ] the tribunal that is to hear the case.” Id. at 701 (quoting Landgraf, 511 U.S. at 274, 114 S.Ct. 1483). In other words, a jurisdictional statute has no retroactive effect if it “affect[s] only where a suit may be brought, not whether it may be brought at all.” Hughes Aircraft, 520 U.S. at 951,117 S.Ct. 1871.
Plaintiffs do not argue that Congress has “expressly prescribed” the temporal reach of the TVPRA. Thus, we proceed to the second step to address whether § 1596 has a retroactive effect.
Plaintiffs claim that § 1596 has no retroactive effect because it is “purely jurisdictional.” They argue that the 2008 Amendment, entitled “Additional jurisdiction in certain trafficking offenses,” only “enlarges the jurisdiction of U.S. courts” by providing them with “extraterritorial jurisdiction over trafficking offenses.”
The Supreme Court’s decision in Hughes Aircraft is instructive. That case concerned whether an amendment to the False Claims Act (“FCA”) could be applied retroactively. Hughes Aircraft, 520 U.S. at 941, 117 S.Ct. 1871. Prior to the amendment, the FCA barred a private party’s qui tam suit “based on information already possessed by the Government.” Id. at 944, 117 S.Ct. 1871. The amendment eliminated this bar in some circumstances. Id. at 941, 117 S.Ct. 1871. The court of appeals held that the amendment “removing certain defenses to qui tam suits should be applied retroactively to suits based on pre-[enactment] conduct because the amendment involved only the ‘subject matter jurisdiction’ of courts to hear qui tam claims and did not affect the substantive liability of *204 qui tam defendants.” Id. at 944-45, 117 S.Ct. 1871.
The Supreme Court reversed, reasoning that the amendment had a retroactive effect under Landgraf. Id. at 946-47, 117 S.Ct. 1871. The Court reasoned that the amendment “changefd] the substance of the existing cause of action for qui tam defendants” by “eliminat[ing] a defense to a qui tam suit — prior disclosure to the Government.” Id. at 948, 117 S.Ct. 1871. The Court also found that the amendment “essentially create[d] a new cause of action” for private parties. Id. at 950, 117 S.Ct. 1871. Before the amendment, “once the United States learned of a false claim, only the Government could assert its rights under the FCA against the false claimant.” Id. at 949, 117 S.Ct. 1871. The amendment therefore resulted in an “extension of an FCA cause of action to private parties in circumstances where the action was previously foreclosed.” Id.
Further, the Court rejected the qui tam plaintiffs’ argument that because the amendment was “jurisdictional,” the “general Landgraf presumption against retro-activity” did not apply. Id. at 950,117 S.Ct. 1871. The Court explained that jurisdiction-allocating statutes are not categorically exempt from the Landgraf analysis. Id. at 950, 117 S.Ct. 1871. Rather, “[t]he fact that courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally applicable presumption against retroactivity.” Id. at 951, 117 S.Ct. 1871. The Court explained that the legal effect of this jurisdictional amendment was not limited to “merely allocating] jurisdiction among forums.” Id. The amendment also “create[d] jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well.” Id. As a result, the FCA amendment was “as much subject to [the] presumption against retroactivity as any other.” Id.
The Supreme Court’s decision in Martin v. Hadix, 527 U.S. 343, 119 S.Ct. 1998,144 L.Ed.2d 347 (1999), confirms that the mere fact that a statute is jurisdictional does not fully resolve the retroactivity inquiry. As the Court explained, “[w]hen determining whether a new statute operates retroactively, it is not enough to attach a label (e.g., ‘procedural,’ ‘collateral’) to the statute.” Id. at 359, 119 S.Ct. 1998. Instead, under Landgraf, our retroactivity inquiry “demands a commonsense, functional judgment about ‘whether the new provision attaches new legal consequences to events completed before its enactment.’” Id. at 357-58, 119 S.Ct. 1998 (quoting Landgraf, 511 U.S. at 270, 114 S.Ct. 1483).
The 2008 Amendment, although jurisdictional in nature, alters a party’s substantive rights under the TVPRA. Pri- or to § 1596, a private party could not maintain a civil cause of action under the TVPRA for forced labor or human trafficking that occurred overseas. Such an action, as noted, would have been barred by the presumption against extraterritoriality. However, by conferring “extra-territorial jurisdiction over any offense ... under” the TVPRA, § 1596 permits private parties to pursue a civil remedy under the TVPRA for extraterritorial violations. As with the amendment in Hughes Aircraft, § 1596 has the legal effect of “eliminat[ing] ... a prior defense.” 520 U.S. at 950, 117 S.Ct. 1871. After § 1596’s enactment, a TVPRA defendant in a civil suit could no longer rely on a previously available defense: the presumption against extraterritoriality. Indeed, Plaintiffs do not identify any forum in which they could have permissibly brought a TVPRA civil cause of *205 action based on their allegations.[8] Consequently, because § 1596 “creat[ed] jurisdiction” for a TVPRA civil case “where none previously existed” it “speaks not just to the power of a particular court but to the substantive rights of the parties as well.” See id. at 951,117 S.Ct. 1871.
Further, Plaintiffs’ emphasis that § 1596 did not alter the unlawfulness of the alleged conduct under the TVPRA is misplaced. In Hughes Aircraft, the federal government would have been able to bring suit against the defendant for the conduct alleged by the private plaintiffs. Prior to § 1596’s enactment, the federal government could have criminally prosecuted parties for extraterritorial violations of §§ 1589 and 1590, the prohibitions against human trafficking and forced labor that KBR is alleged to have violated. See 18 U.S.C. § 3261. However, despite these pre-existing criminal prohibitions, § 1596 exposed a TVPRA defendant to civil claims brought by private parties. Such a result fits squarely within Hughes Aircraft’s reasoning: “In permitting actions by an expanded universe of plaintiffs with different incentives [than the federal government], the [2008 Amendment] essentially creates a new cause of action.” See 520 U.S. at 950, 117 S.Ct. 1871.
Plaintiffs counter that even if § 1596 removed a defense to a civil suit under the TVPRA, the law nonetheless did not alter the parties’ substantive rights given other laws in effect at the time of the alleged conduct. Specifically, they contend that KBR was already “civilly liable for the samé conduct under common law and Iraqi law, which provide the same tort remedies.” Under this interpretation, permitting Plaintiffs to pursue their TVPRA claims would have no retroactive effeet if the parties’ rights and remedies under the TVPRA are identical to their pre-existing rights and remedies under other laws.
In support, Plaintiffs cite two cases in which other courts have found that the Torture Victim Protection Act — which created a civil cause of action for torture— would not have a retroactive effect because it created “no new liabilities” and did not “impair rights.” See Cabello v. Fernandez-Larios, 402 F.3d 1148, 1154 (11th Cir. 2005); Alvarez-Machain v. United States, 107 F.3d 696, 702 (9th Cir. 1996). Both of these cases, however, concluded that the Torture Victim Protection Act was indistinguishable from claims made available under the ATS. Cabello, 402 F.3d at 1154; Alvarez-Machain, 107 F.3d at 702-03.
By contrast, Plaintiffs cannot prove there exist parallel rights and remedies under the ATS. After Kiobel, Plaintiffs’ extraterritorial ATS claims are barred, and the 2008 Amendment removed the previously available defense of extraterritoriality. The ATS cannot be said to pro *206 vide parallel rights or remedies to Plaintiffs’ extraterritorial TVPRA claims. See Kiobel, 133 S.Ct. at 1663-65.
Plaintiffs also argue that the parties’ rights and liabilities under preexisting foreign and state law defeat the district court’s conclusion that § 1596 attaches new legal consequences. We find these arguments unavailing. First, Plaintiffs cite the Iraqi Civil Code, which they argue authorizes tort victims — including victims of trafficking — to bring claims for civil remedies. Yet, even if KBR may be liable under Iraqi law, Plaintiffs have not proven that the remedies under the TVPRA and Iraqi Civil Code are co-extensive. Plaintiffs, for instance, seek punitive damages in this case. But whereas the TVPRA authorizes punitive damages, Francisco v. Susano, 525 Fed.Appx. 828, 835 (10th Cir. 2013); Ditullio v. Boehm, 662 F.3d 1091, 1096 (9th Cir. 2011), no such damages are available under Iraqi law, Harris v. Kellogg, Brown & Root Sews., Inc., 796 F.Supp.2d 642, 666 (W.D. Pa. 2011). “Retroactive imposition of punitive damages” is precisely what the Supreme Court found problematic in Landgraf. See 511 U.S. at 281,114 S.Ct. 1483.
Second, Plaintiffs cite the “transitory tort doctrine,” arguing that KBR would have been liable under state tort law. But Plaintiffs’ state law claims are barred by the statute of limitations. Allowing Plaintiffs to retroactively bring a TVPRA claim would eliminate that defense, thereby imposing new liability to KBR. See Hughes Aircraft, 520 U.S. at 948, 117 S.Ct. 1871. Additionally, Plaintiffs’ rights or remedies under expired claims cannot be said to parallel the remedies that the TVPRA would make available if applied. Consequently, allowing Plaintiffs to bring a TVPRA claim would have an impermissible retroactive effect.

3. The MEJA’s Criminal Jurisdiction

Plaintiffs alternatively rely on the Military Extraterritorial Jurisdiction Act (“MEJA”) as a basis for jurisdiction for the TVPRA civil claims. Plaintiffs contend that the TVPRA’s civil remedy attaches whenever a person subject to the court’s jurisdiction commits a trafficking offense— regardless of whether the person is criminally prosecuted. In other words, Plaintiffs argue that MEJA’s limited extraterritorial extension of a host of federal offenses, including §§ 1589 and 1590 of the TVPRA, can be married with TVPRA’s civil-remedy provision to provide an alternative “jurisdictional” basis for Plaintiffs’ claim. MEJA applies to “[criminal offenses committed by certain members of the Armed Forces and by persons employed by or accompanying the Armed Forces outside the United States.” 18 U.S.C. § 3261. Plaintiffs argue that when Congress enacted the 2008 Amendment, it built upon the existing TVPRA and MEJA framework and did not exempt TVPRA violations by MEJA-cov-ered persons. However, Plaintiffs do not cite any cases in which MEJA triggered the TVPRA and permitted jurisdiction.
It is undisputed that the TVPRA provisions KBR is alleged to have violated— § 1589 and § 1590 — could have been prosecuted under MEJA. However, this Court declines to find that MEJA’s grant of criminal jurisdiction over felony offenses committed abroad gives Plaintiffs an alternative jurisdictional basis for their civil claims. Congress must clearly express an affirmative intention to give a statute extraterritorial effect. Morrison, 561 U.S. at 255, 130 S.Ct. 2869. It is simply not clear that Congress affirmatively intended to give extraterritorial effect to the TVPRA civil-remedy provision via an unrelated criminal statute that is nowhere referenced in the TVPRA. We agree with the district court’s conclusion that MEJA is “simply *207 not relevant to the question of whether Congress intended to legislate extraterri-torially when it enacted ... the TVPRA.” The connection between these statutes is too attenuated for the Court to find jurisdiction on this basis.
C. The State Law Claims
The district court dismissed Plaintiffs’ negligence claims as time barred under California or Texas law and declined to toll the claims. Plaintiffs argue that if their claims did not touch and concern the United States, then the choice-of-law analysis should have led to the application of Iraqi law. KBR contends that Plaintiffs cannot revive their state law negligence claims by invoking Iraq’s statute of limitations for the first time on appeal. KBR argues that Plaintiffs waived any right to the application of Iraqi law by not raising that argument earlier and that the district court properly rejected Plaintiffs’ conclusory arguments for tolling the limitations.
Plaintiffs argue there is no waiver when there is a change in law. They cite McGee v. Arkel Int’l, LLC, 671 F.3d 639 (5th Cir. 2012), as a case in which “this Circuit held for the first time that Iraqi law may apply to contractor conduct in Iraq.” The problem, however, is that even if this Court viewed McGee as changing the law, it issued that opinion in 2012. While Plaintiffs discussed McGee in 2014, they did not make this argument until 2015 on appeal. The district court initially issued an order in 2009 addressing only California and Texas law. The district court entertained a motion to reconsider, and there were other opportunities for Plaintiffs to request the application of the Iraqi statute of limitations.
In the alternative, Plaintiffs argue that if California or Texas law applies, the Court should apply equitable tolling. “The doctrine of equitable tolling preserves a plaintiffs claims when strict application of the statute of limitations would be inequitable.” United States v. Patterson, 211 F.3d 927, 930 (5th Cir. 2000) (quoting Davis v. Johnson, 158 F.3d 806, 810 (5th Cir. 1998)). Courts apply equitable tolling “principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights.” Id. (citations omitted). We review the district court’s decision to deny equitable tolling for abuse of discretion, unless the district court denied tolling as a matter of law. See Palacios v. Stephens, 723 F.3d 600, 603 (5th Cir. 2013).
Plaintiffs argue that the civil conflict in Nepal delayed their suit. The district court rejected this argument, finding that “[geographic location and personal hardship cannot provide the sole basis for tolling an otherwise applicable statute of limitations.” Moreover, the district court cited Plaintiffs’ other potential avenues for relief. We find the district court did not abuse its discretion in denying tolling.
III. CONCLUSION
For the foregoing reasons, we AFFIRM.

. KBR refers to several related corporate entities — all named as Defendants in this case.

. Plaintiffs also asserted claims under the Racketeer Influenced and Corrupt Organization statute ("RICO”), which the district court dismissed. Because Plaintiffs do not challenge the dismissal of these claims, they are not at issue on appeal.

. The plaintiffs in Kiobel alleged that after residents of Ogoniland, Nigeria, began to protest the defendants' oil exploration in that area, the defendants "enlisted the Nigerian Government to violently suppress [these] burgeoning demonstrations.” 133 S.Ct. at 1662. The plaintiffs further alleged that the defendants "aided and abetted” the Nigerian military and police forces in committing atrocities against the Ogoni residents, including by providing the "Nigerian forces with food, transportation, and compensation.” Id. at 1663. The defendants’ only identified contact with the United States was that their shares were listed on the New York Stock Exchange and an affiliated company had an office in New York City. Id. at 1677 (Breyer, J., concurring).

. It is worth noting the scope of Plaintiffs’ reasoning: it is not limited to the ATS. Plaintiffs’ contention would compel the conclusion that federal laws generally applied to Al Asad in 2004.

. Plaintiffs also cite the Supreme Court’s analysis in Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), which adopted a functional approach rather than a "formalistic sovereignty-based test for determining the reach of the Suspension Clause.” Id. at 762, 128 S.Ct. 2229. They argue that we should apply Boumediene's analysis to decide whether Al Asad constituted United States territory for purposes of the presumption against extraterritoriality. KBR counters that Boumediene is inapposite because it was “driven by separation-of-powers concerns,” namely the essential role the writ of habeas corpus has on constraining government authority. See Boumediene, 553 U.S. at 765-66, 128 S.Ct. 2229. By contrast, the presumption against extraterritoriality — a canon of statutory interpretation — is only "a presumption about a statute’s meaning, rather than a limit upon Congress’s power to legislate.” Morrison, 561 U.S. at 255, 130 S.Ct. 2869. We agree with KBR that Boumediene’s analysis does not apply. See Marshall, 2014 WL 1213473, at *7 ("Boumediene is not simply a rights-based decision which bestows rights and freedoms upon those at Guantánamo. Rather, it is a limitation on government power to act extra-judicially in a place that is functionally a territory of the United States.”). *197 Thus, we address Plaintiffs’ claim based solely on Rasul because it explicitly addressed the presumption against extraterritoriality.

. As KBR explains, "even after KBR raised Kiobel in a supplement to its motion for summary judgment, Plaintiffs still did not seek leave to amend, arguing instead that their claims as-then-pleaded satisfied Kiobel's ‘touch and concern’ language.”

. The Fifth Circuit has held that the legislative history may be informative in discerning whether a law was clarifying. See Belli, 981 F.2d at 841; Cowden, 895 F.2d at 1500. However, in this case, Plaintiffs have failed to introduce any evidence in the legislative history to support their view. Even if we were to rely on the legislative history, we find that it *202 supports the view that Congress expanded jurisdiction rather than simply clarifying existing jurisdiction. The House Report for the original version of what became the 2008 amending act states: "This section provides jurisdiction to U.S. courts.” H.R. Rep. No. 110-430(1), at 55 (2007) (emphasis added). The language "provides jurisdiction” implies that such jurisdiction did not already exist.

. Plaintiffs rely heavily on Gordon v. Pete's ' Auto Service of Denbigh, Inc., 637 F.3d 454 (4th Cir. 2011). However, Gordon is distinguishable. That case involved § 307 of the Servicemembers Civil Relief Act ("SCRA”), which "prohibits enforcement of liens against servicemembers during military service." Id. at 456 (citing 50 U.S.C. app. § 537). The question was whether a new federal law— § 802 of the SCRA — which provided a federal cause of action to enforce § 307’s protections would have a retroactive effect under Landgraf. Id. at 458-59. The Fourth Circuit found that the new federal law did not "impair[] the parties' rights or impose[] new duties” because § 307’s right of non-foreclosure “was already enforceable” in a state court conversion act. Id. at 459-60 ("In fact, § 307 contemplates that the owner’s right might be enforced in a conversion action,”). By contrast, Plaintiffs have not asserted that they could have enforced TVPRA’s substantive protections — i.e., § 1589 and § 1590 — before the 2008 Amendment. Thus, unlike the law in Gordon, the 2008 Amendment made the TVPRA’s conduct-regulating provisions enforceable in civil suits for a new class of claims.