**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN DOE, I; JOHN DOE, II; JOHN DOE, III; JOHN DOE, IV; JOHN DOE, V; and JOHN DOE, VI, each individually and on behalf of proposed class members, *Plaintiffs-Appellants*, | No. 17-55435 D.C. No. 2:05-cv-05133-SVW-MRW |
| v. | ORDER AND AMENDED OPINION |
| NESTLE, S.A.; NESTLE USA, INC.; NESTLE IVORY COAST; CARGILL INCORPORATED COMPANY; CARGILL COCOA; CARGILL WEST AFRICA, S. A.; ARCHER DANIELS MIDLAND COMPANY, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted June 7, 2018
Pasadena, California

Filed October 23, 2018
Amended July 5, 2019

Before: Dorothy W. Nelson and Morgan Christen, Circuit
Judges, and Edward F. Shea,[*] District Judge.

Order;
Dissent to Order by Judge Bennett;
Opinion by Judge D.W. Nelson;
Concurrence by Judge Shea

## SUMMARY[**]

### Alien Tort Statute

The panel filed (1) an order amending its opinion,
denying a petition for panel rehearing, and denying on behalf
of the court a petition for rehearing en banc; and (2) an
amended opinion reversing the district court's dismissal of
claims of aiding and abetting slave labor in violation of the
Alien Tort Statute.

In its amended opinion, the panel reversed the district
court's dismissal, which was based on the district court's
conclusion that the complaint, brought by former child slaves
who were forced to work on cocoa farms in the Ivory Coast
against manufacturers, purchasers, and retail sellers of cocoa
beans, sought an impermissible extraterritorial application of
the Alien Tort Statute. In a two-step analysis, the panel

---

[*] The Honorable Edward F. Shea, United States District Judge for the
Eastern District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

concluded that the ATS is not extraterritorial, but, looking to the statute's focus, the complaint alleged a domestic application of the statute in defendants' funding of child slavery practices. The panel concluded that plaintiffs' allegations painted a picture of overseas slave labor that defendants perpetuated from headquarters in the United States, and this narrow set of domestic conduct was relevant to the ATS's focus. The panel remanded to allow plaintiffs to amend their complaint to specify, in light of *Jesner v. Arab Bank*, 138 S. Ct. 1386 (2018), whether aiding and abetting conduct that took place in the United States was relevant to the domestic corporations named as defendants. The panel held that plaintiffs had Article III standing to bring their claims because they alleged concrete and redressable injury that was fairly traceable to the challenged conduct of one defendant, and their allegations against another defendant were sufficient to allow a final opportunity to replead.

District Judge Shea concurred in the result.

Judge Bennett, joined by Judges Bybee, Callahan, Bea, Ikuta, and R. Nelson; and joined by Judges M. Smith and Bade as to Part II, dissented from the denial of rehearing en banc. In Part I, Judge Bennett wrote that, after *Jesner*, corporations, foreign or domestic, are not proper ATS defendants. In Part II, Judge Bennett wrote that plaintiffs' claims were impermissibly exterritorial because the allegations in the complaint were clear that all the relevant misconduct took place in Côte d'Ivoire, not the United States.

## COUNSEL

Paul L. Hoffman (argued), John Washington, and Catherine Sweetser, Schonbrun Seplow Harris & Hoffman LLP, Los Angeles, California; Terrence P. Collingsworth, International Human Rights Advocates, Washington, D.C.; for Plaintiffs-Appellants.

Theodore J. Boutrous, Jr. (argued), Abbey Hudson, Matthew A. Hoffman, and Perlette Michèle Jura, Gibson Dunn & Crutcher LLP, Los Angeles, California; Christopher B. Leach and Theodore B. Olson, Gibson Dunn & Crutcher LLP, Washington, D.C.; Colleen Sinzdak, David M. Foster, Craig A. Hoover, and Neal Kumar Katyal, Hogan Lovells US LLP, Washington, D.C.; for Defendant-Appellee Nestlé USA, Inc.

Andrew John Pincus (argued) and Kevin S. Ranlett, Mayer Brown LLP, Washington, D.C.; Lee H. Rubin, Mayer Brown LLP, Mayer Brown LLP, Palo Alto, California; for Defendant-Appellee Cargill Incorporated.

Marc B. Robertson and Richard A. Stamp, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.

**ORDER**

The Opinion filed on October 23, 2018, is amended as follows:

IV. Plaintiffs Have Standing to Bring Their Claims

Defendants argue that plaintiffs lack Article III standing to bring their claims. To have standing, plaintiffs must allege "[(1)] a concrete and particularized injury [(2)] that is fairly traceable to the challenged conduct, [(3)] and is likely to be redressed by a favorable judicial decision." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1187 (9th Cir. 2016), cert. denied, (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)).

Plaintiffs easily satisfy the first and third requirements. Defendants do not dispute that plaintiffs suffered concrete injury by being abused and held as child slaves. In addition, plaintiffs' injuries are redressable because when "one private party is injured by another, the injury can be redressed in at least two ways: by awarding compensatory damages or by imposing a sanction on the wrongdoer that will minimize the risk that the harm-causing conduct will be repeated." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 127 (1998).

Plaintiffs also satisfy the traceability requirement as to Cargill because they raise sufficiently specific allegations regarding Cargill's involvement in farms that rely on child slavery. *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1343 (11th Cir. 2011); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (Article III traceability requirement "does not exclude injury produced by determinative or coercive effect upon the action of someone else."). Plaintiffs' allegations against Nestle are far less clear, though part of the difficulty is plaintiffs' reliance on collective allegations against all or at least multiple defendants. Notwithstanding this deficiency, the allegations are sufficient to at least allow plaintiffs a final opportunity to replead. On remand, plaintiffs must eliminate the allegations against foreign defendants and specifically identify the culpable conduct attributable to individual domestic defendants.

With the Amended Opinion, a majority of the panel voted to deny the petition for panel rehearing. Judges D. Nelson and Christen voted to deny the petition for panel rehearing, and Judge Shea voted to grant the petition for panel rehearing.

Judge Christen voted to deny the petition for rehearing en banc, and Judge D. Nelson so recommended. Judge Shea recommended granting the petition for rehearing en banc. The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on whether to

rehear the matter en banc. The matter failed to receive a majority of the votes of non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35. No further petitions for rehearing will be entertained.

The petition for rehearing and petition for rehearing en banc are **DENIED**. Judge Bennett's dissent from the denial of rehearing en banc is filed concurrently herewith. Judges Wardlaw, Watford, Owens, Friedland, Miller, and Collins did not participate in the deliberations or vote in this case.

---

BENNETT, Circuit Judge, with whom BYBEE, CALLAHAN, BEA, IKUTA, and R. NELSON, Circuit Judges, join, and with whom M. SMITH and BADE, Circuit Judges, join as to Part II, dissenting from the denial of rehearing en banc:

The Supreme Court has told us that the Alien Tort Statute ("ATS") must be narrowly construed and sparingly applied, in line with its original purpose: "to help the United States avoid diplomatic friction" by providing "a forum for adjudicating that 'narrow set of violations of the law of nations' that, if left unaddressed, 'threaten[ed] serious consequences' for the United States." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1410 (2018) (Alito, J., concurring) (alteration in original) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 715 (2004)). The Court has given us a roadmap to determine whether artificial entities like corporations can be liable for ATS violations. And the Court has made it equally clear that the ATS reaches only domestic conduct—where a claim "seek[s] relief for violations of the law of nations occurring outside the United States," the claim

is "barred." *Kiobel v. Royal Dutch Petroleum Co.* (*Kiobel II*), 569 U.S. 108, 124 (2013). Violations of the law of nations—like genocide, slavery, and piracy—are horrific. But in its zeal to sanction alleged violators, the panel majority has ignored the Court's ATS roadmap. First, the panel majority has failed to properly analyze under *Jesner* whether a claim against these corporate defendants may proceed. And second, the panel majority has compounded that error by allowing this case to move forward notwithstanding that Defendants' alleged actionable conduct took place almost entirely abroad, turning the presumption against extraterritoriality on its head.

*Jesner* changed the standard by which we evaluate whether a class of defendants is amenable to suit under the ATS. Corporations are no longer viable ATS defendants under either step one or step two of the two-step approach the Court announced in *Sosa*, as applied in *Jesner*. The panel majority, however, fails to apply *Jesner*'s controlling analysis and applies an incorrect theory of ATS corporate liability even as the Supreme Court suggests that we reach the opposite conclusion.

The panel majority also all but ignores the Court's instruction that an ATS claim must "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application" of the ATS. *Kiobel II*, 569 U.S. at 124–25. Plaintiffs' allegations—based almost entirely on violations of the law of nations that allegedly occurred in Africa—are wholly insufficient to state a claim.

The Supreme Court has instructed that we must "exercise 'great caution' before recognizing new forms of liability under the ATS." *Jesner*, 138 S. Ct. at 1403 (quoting *Sosa*,

542 U.S. at 728). We should have heeded this instruction and taken this case en banc to hold that these corporations may not be sued under the ATS and to make clear that the presumption against extraterritoriality still applies in the Ninth Circuit.[1] Thus, I respectfully dissent from the denial of rehearing en banc.

---

[1] Although not within the scope of Defendants' petitions for rehearing en banc, I believe that it was error for this court to conclude in *Doe I v. Nestle USA, Inc.* (*Nestle I*), 766 F.3d 1013 (9th Cir. 2014) that aiding-and-abetting liability is available under the ATS. As the government previously argued in another ATS case, "the adoption of aiding and abetting liability is a 'vast expansion of federal law' that federal courts must eschew in the absence 'of congressional direction to do so.'" Brief for the United States as Amicus Curiae in Support of Petitioners, at 8, *Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008) (No. 07-919), 2008 WL 408389, at \*8 (hereinafter "Br. for the U.S. as Amicus Curiae") (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 464, 183 (1994)). Thus, the fact that the ATS provides for primary liability does not, in the absence of further congressional action, create secondary liability. *See Cent. Bank*, 511 U.S. at 182 ("[W]hen Congress enacts a statute under which a person may sue or recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.").

Just as Congress has not extended the ATS to corporations (and, in fact, expressly limited the Torture Victim Protection Act to individual liability, *see* infra Part I.C), it has not created ATS aiding-and-abetting liability either. Courts, including our own, that have permitted plaintiffs to bring claims for aiding-and-abetting ATS violations have, in the words of the Solicitor General, "veered far off course under the ATS." Br. for the U.S. as Amicus Curiae at 10.

## I.  After *Jesner*, Corporations Are Not Proper ATS Defendants.

Just last term, the Supreme Court held in *Jesner* that the ATS's jurisdictional grant does not extend to foreign corporations. 138 S. Ct. at 1407. This appeal presents the question that the Supreme Court expressly left open in *Jesner*: can corporations *ever* be proper ATS defendants? The panel majority avoided this issue by relying on discredited circuit precedent. Applying the correct standard post-*Jesner*, corporations (foreign or not) are clearly not proper ATS defendants. It was error for the panel majority to hold otherwise, and we should have corrected that error en banc.

To determine whether to recognize a cause of action under the ATS, we look to *Sosa*, which involves a "two-step process." *Jesner*, 138 S. Ct. at 1409 (Alito, J., concurring). "First, a court must determine whether the particular international-law norm alleged to have been violated is 'accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms.'" *Id.* at 1419 (Sotomayor, J., dissenting) (quoting *Sosa*, 542 U.S. at 725). "Second, if that threshold hurdle is satisfied, a court should consider whether allowing a particular case to proceed is an appropriate exercise of judicial discretion." *Id.* at 1420. Corporate liability fails at both steps.

In *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 760 (9th Cir. 2011) (en banc), *vacated and remanded*, 569 U.S. 945 (2013), we held that if a norm of conduct is sufficiently established to give rise to ATS liability, the only relevant liability question is whether the defendant is capable of violating the norm. Although the Supreme Court vacated *Sarei* in light of

*Kiobel II*, we doubled down on *Sarei*'s erroneous reasoning in *Doe I v. Nestle USA, Inc.* (*Nestle I*), 766 F.3d 1013 (9th Cir. 2014), when we held that where there exists a "universal and absolute" norm of conduct that is "applicable to 'all actors,'" any accused violator is subject to jurisdiction of the United States courts under the ATS. *Id.* at 1022 (quoting *Sarei*, 671 F.3d at 760). As far as I am aware, we have never analyzed the corporate liability issue under *Sosa* step two. The panel majority has neglected to do so here.

Judge Bea persuasively explained why the *Sarei*/*Nestle I* approach to corporate liability was inconsistent with established Supreme Court precedent, *see Doe I v. Nestle USA, Inc.*, 788 F.3d 946 (9th Cir. 2015) (Bea, J., dissenting from the denial of rehearing en banc) ("*Nestle I* Dissental"), and I do not repeat those arguments here. After *Jesner*, though, there should be no serious doubt that our court's approach to this issue is incomplete, and the en banc court should have stepped in to correct the panel majority's failing.

## A.  *Nestle I* is no longer good law on the corporate-liability issue.

In holding that foreign corporate defendants are categorically not amenable to suit under the ATS, *Jesner* was explicit that federal courts can and must—contrary to *Nestle I*—determine whether certain categories of defendant are beyond the reach of an ATS claim. *See Jesner*, 138 S. Ct. at 1402–03. The panel majority's application of *Nestle I* to the corporate defendants here, post-*Jesner*, was at best incomplete and at worst simply wrong. In addition, while *Jesner*'s holding was limited by its terms to foreign corporations, five justices in *Jesner* authored or joined

opinions that called into serious doubt the validity of ATS claims against domestic corporations.

> ### 1. We should have taken this case en banc to expressly reject *Nestle I*'s approach to corporate liability questions.

First, *Jesner* directly conflicts with the *Nestle I* approach—in particular, our holding that "there is no categorical rule of corporate immunity or liability" under the ATS. *Nestle I*, 766 F.3d at 1022 (citing *Sarei*, 671 F.3d at 747). In *Jesner*, the Court explained that its "general reluctance to extend judicially created private rights of action . . . extends to the question whether the courts should exercise the judicial authority to mandate a rule that imposes liability upon artificial entities like corporations." *Jesner*, 138 S. Ct. at 1402–03. Justice Kennedy's opinion for the Court answered that question in the negative for foreign corporations, and in the process invited the lower courts to consider whether the question should be answered similarly as to domestic corporations. *See id*. at 1402.

Here, the panel majority correctly acknowledged that *Jesner* abrogated *Nestle I* to the extent that *Nestle I* permitted an ATS suit against foreign corporate defendants. *Doe v. Nestle, S.A.* (*Nestle II*), 906 F.3d 1120, 1124 (9th Cir. 2018). But the panel majority's subsequent conclusion that *Jesner* left undisturbed this court's treatment of domestic corporations under the ATS, *id.*, was incorrect. *Jesner*'s holding, to be sure, was limited to foreign corporations, but by acknowledging the existence of categorical rules restricting the ATS liability of certain classes of corporate actors, *Jesner* requires us to discard the approach we adopted in *Sarei* (and re-embraced in *Nestle I*), which focused entirely

on the question whether a norm of *conduct* is sufficiently universal to support an ATS claim. *Jesner* thus confirmed Judge Bea's dissental's conclusion in *Nestle I*: "there must be a meaningful inquiry—not a mere labeling of norms as 'categorical'"—into whether the ATS supports liability against a given defendant. *Nestle I* Dissental, 788 F.3d at 955. Not only did the panel majority fail to conduct a *meaningful* inquiry into corporate liability, it inexplicably failed to conduct any inquiry at all: "*Jesner* did not eliminate all corporate liability under the ATS, and we therefore continue to follow *Nestle I*'s holding as applied to domestic corporations." *Nestle II*, 906 F.3d at 1124. The en banc court should have corrected that very clear error.

### 2. Five justices in *Jesner* strongly suggested that the ATS forecloses corporate liability.

Although *Jesner* did not explicitly rule out domestic corporate ATS liability, there is no basis for the panel majority's conclusion that *Jesner* preserved our court's status quo. Justice Kennedy's three-justice plurality opinion does not mince words in arguing that "[t]he international community's conscious decision to limit the authority of . . . international tribunals to natural persons counsels against a broad holding that there is a specific, universal, and obligatory norm of corporate liability under currently prevailing international law." 138 S. Ct. at 1401 (plurality op.).

Justice Alito's view is similar:

> Federal courts should decline to create federal common law causes of action under *Sosa*'s second step whenever doing so would not

materially advance the ATS's objective of avoiding diplomatic strife. . . . All parties agree that customary international law does not *require* corporate liability as a general matter. But if customary international law does not require corporate liability, then declining to create it under the ATS cannot give other nations just cause for complaint against the United States.

*Id.* at 1410 (Alito, J., concurring) (citation omitted). Corporate liability would "not materially advance the ATS's objective of avoiding diplomatic strife." *Id.*

Finally, Justice Gorsuch would have gone even further than the plurality and held that the courts lack authority to create *any* new causes of action under the ATS other than those recognized by the First Congress, which would not include the claims that Plaintiffs here raise. *Id*. at 1412–13 (Gorsuch, J., concurring).

In short, five justices signaled in *Jesner* that they would hold that corporations are not subject to the ATS. We should have revisited en banc the panel majority's holding that *Jesner* had no impact at all on this issue.[2]

---

[2] The panel majority's application of *Nestle I* in this case was based on *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), in which we held that "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority." *Id.* Because *Jesner* is "clearly irreconcilable" with *Nestle I*, *Miller* provides an additional compelling reason for us to have taken this case up en banc to conduct the analysis required by "higher authority."

**B. No specific, universal, and obligatory norm of international law extends liability to corporate defendants, and such claims are not cognizable under the ATS.**

Because no sufficiently established norm of international law subjects corporations to liability, an ATS claim cannot lie against corporations.

**1. International law, not federal common law, supplies the rule of decision on corporate liability.**

As I explained above, the Court in *Sosa* directed lower courts to consider "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." 542 U.S. at 732 n.20; *see also id.* at 760 (Breyer, J., concurring) (restating the Court's holding that "[t]he norm must extend liability to the type of perpetrator . . . the plaintiff seeks to sue"). Properly understood, *Sosa* forecloses any argument that the ATS provides authority for the creation of new causes of action under federal common law.[3] *See Kiobel v. Royal Dutch Petroleum Co.* (*Kiobel I*), 621 F.3d 111, 127 (2d Cir. 2010) (*Sosa* "requires that we look to *international law* to determine our jurisdiction over ATS claims against a particular class of defendant, such as corporations").

---

[3] This view is consistent with Judge Edwards's concurrence in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), which looked to the lack of "consensus on non-official torture" to conclude that the ATS did not "cover torture by non-state actors." *Id.* at 795 (Edwards, J., concurring).

Some courts have concluded that corporate liability is permitted by the ATS, reasoning that while customary international law supplies the cause of action (in this case, a claim for redress of child slavery), "the technical accoutrements to the ATS cause of action, such as corporate liability[,] . . . are to be drawn from federal common law[.]" *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 51 (D.C. Cir. 2011), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013); *see also Flomo v. Firestone Nat. Rubber Co.*, 643 F.3d 1013, 1020 (7th Cir. 2011) ("International law imposes substantive obligations and the individual nations decide how to enforce them.").

These views are flatly inconsistent with *Sosa*, which requires that courts evaluate the potential liability under international law for certain classes of defendants. And following *Jesner*, these views are even less tenable. Indeed, Justice Sotomayor's *Jesner* dissent specifically invokes the distinction between norms of "substantive conduct," which she argues are determined by international law, and "rules of how to enforce international-law norms," which she argues are left to the individual states. *Jesner*, 138 S. Ct. at 1420 (Sotomayor, J., dissenting). That contention, however, only garnered the support of four justices, and was characterized by the plurality as "far from obvious," *id.* at 1402 (plurality op.). In any event, *Sosa* defines our inquiry and requires us to determine questions of corporate liability by reference to international law.

**2. An ATS claim does not lie against corporations because there is no universally accepted international law norm of corporate liability.**

Applying *Sosa*'s step one to the question of corporate liability under the ATS, I agree with Justice Kennedy's plurality opinion in *Jesner*, Judge Cabranes's opinion for the Second Circuit in *Kiobel I*, and then-Judge Kavanaugh's dissent in *Exxon Mobil*, that allowing an ATS claim against a corporation does not "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" on which the ATS was based. *Sosa*, 542 U.S. at 725; *see also Jesner*, 138 S. Ct. at 1401 (plurality op.) ("The international community's conscious decision to limit the authority of these international tribunals to natural persons counsels against a broad holding that there is a specific, universal, and obligatory norm of corporate liability under currently prevailing international law."); *Kiobel I*, 621 F.3d at 141 ("[T]here is nothing to demonstrate that corporate liability has yet been recognized as a norm of the customary international law of human rights."); *Exxon Mobil*, 654 F.3d at 81 (Kavanaugh, J., dissenting) ("[C]laims under the ATS are defined and limited by customary international law, and customary international law does not extend liability to corporations.").

As Judge Leval's concurrence in *Kiobel I* recognized, "international law, of its own force, imposes no liabilities on corporations or other private juridical entities." *Kiobel I*, 621 F.3d at 186 (Leval, J., concurring). That conclusion is dispositive—in the absence of a clearly defined, universal norm of corporate liability under customary international law,

the remaining domestic corporate defendants are entitled to dismissal.

I note finally that only a few courts have argued that there is, in fact, a specific, universal, and obligatory norm of corporate liability under international law (*Flomo*, 643 F.3d at 1016, for example, makes this argument). This view is the minority and seems to be contrary to fact. Even Justice Sotomayor's *Jesner* dissent does not argue that such a norm exists. Rather, Justice Sotomayor argues, echoing Judge Leval and others, that there is no international-law reason to distinguish between corporations and natural persons, and thus federal common law (which recognizes corporate liability) should supply the rule of decision. *See Jesner*, 138 S. Ct. at 1425 (Sotomayor, J., dissenting).

Looking to federal common law to fill the gaps where international law is silent is problematic for several reasons. First, it ignores *Sosa*'s requirement that we look to a given defendant's potential liability under international law to determine whether an ATS claim lies. 542 U.S. at 732 n.20. If there is no international law liability, the ATS does not permit courts to impute liability from another body of substantive law. Second, it simply ignores "the fact that no international tribunal has ever been accorded jurisdiction over corporations." *Kiobel I*, 621 F.3d at 145. Third, it is a completely backwards application of *Sosa* step one. Rather than asking whether the norm of corporate liability "is sufficiently definite" under international law, *Sosa*, 542 U.S. at 732, it purports to derive a new type of ATS liability from the *absence* of an international law norm distinguishing between individual and corporate actors. *See Jesner*, 138 S. Ct. at 1425 (Sotomayor, J., dissenting) (quoting Judge Leval's concurrence in *Kiobel I*, 621 F.3d at 175, for the proposition

that "international law . . . takes no position on the question" whether international law distinguishes between a corporation and natural person). But the ATS does not give federal courts the "power to mold substantive law." *Sosa*, 542 U.S. at 713. In the absence of a clear norm of corporate liability under international law, we cannot extend the ATS to reach corporate actors. *See Kiobel I*, 621 F.3d at 120–21 ("[T]he responsibility of establishing a norm of customary international law lies with those wishing to invoke it, and in the absence of sources of international law endorsing (or refuting) a norm, the norm simply cannot be applied in a suit grounded on customary international law under the ATS.").

### C. The caution urged by the Court in ATS cases counsels heavily against permitting an ATS claim against corporations.

The inquiry should end at *Sosa* step one. But were we to move to *Sosa* step two, dismissal would still be appropriate because only Congress, not the courts, may extend the ATS's reach to corporate actors. *Sosa* step two, as the Supreme Court applied it in *Jesner*, compels a holding that corporate liability simply does not lie under the ATS absent express congressional approval.

The appropriate inquiry here is "whether allowing [a] case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific authority before corporate liability can be imposed." *Jesner*, 138 S. Ct. at 1399 (plurality op.). Since *Sosa*, the Court has consistently urged lower federal courts to exercise "great caution" before extending the ATS to cover new forms of liability not contemplated by the First Congress. *Sosa*, 542 U.S. at 728. In *Kiobel II*, for example,

the Court observed that foreign policy concerns "are implicated in any case arising under the ATS," and reiterated the need for deference to the political branches before fashioning new ATS causes of action. 569 U.S. at 117.

In *Jesner*, the Court relied on this judicial reluctance in declining to extend ATS liability to foreign corporations. Highlighting foreign policy and separation-of-powers concerns, the *Jesner* majority reiterated that the responsibility for creating new causes of action—particularly in areas that touch foreign policy (as any ATS case does)—lies with Congress and the President. 138 S. Ct. at 1402–03, 1407.

The panel majority has failed to exercise the caution that the Supreme Court demands in ATS cases. Following the Court's lead in *Jesner*, we should have held that corporate ATS liability fails *Sosa* step two for two reasons: the Congressional enactment of the Torture Victim Protection Act of 1991 ("TVPA"), and the Court's *Bivens* jurisprudence.

First, we have some "congressional guidance in exercising jurisdiction." *Sosa*, 542 U.S. at 731. The TVPA—the *only* ATS cause of action created by Congress, *see* 28 U.S.C. § 1350 note—expressly limits liability to "individuals." As the *Jesner* plurality explained, the fact that corporations cannot be sued under the TVPA "reflects Congress' considered judgment of the proper structure for a right of action under the ATS. Absent a compelling justification, courts should not deviate from that model." 138 S. Ct. at 1403 (plurality op.). The TVPA is "all but dispositive" of the issue of corporate liability under the ATS. *Id.* at 1404 (plurality op.). On the sole occasion it has implemented the ATS for a specific class of conduct,

Congress specifically chose to exempt corporations from liability.

Second, insofar as the Court has expressed considerable skepticism of expanding the breadth of the ATS in the absence of Congressional guidance, its *Bivens* jurisprudence (which "provides . . . the closest analogy" to the ATS, *Sosa*, 542 U.S. at 743 (Scalia, J., concurring in part)) is highly instructive. In *Jesner*, the Court cited a *Bivens* case, *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001), for the proposition that "[a]llowing corporate liability would have been a 'marked extension' of *Bivens* that was unnecessary to advance its purpose." 138 S. Ct. at 1403. As the *Jesner* Court then explained, "[w]hether corporate defendants should be subject to suit was 'a question for Congress, not us, to decide.'" *Id.* (quoting *Malesko*, 534 U.S. at 72). The Court then immediately observed that "[n]either the language of the ATS nor the precedents interpreting it support an exception to these general principals in this context." *Id.* at 1403.

*Jesner*'s discussion of *Bivens* and *Malesko* should dictate the outcome here. In *Malesko*, the Court reasoned that corporations are immune from *Bivens* actions because, "if a corporate defendant is available for suit, claimants will focus their collection efforts on it, and not the individual directly responsible for the alleged injury." 534 U.S. at 71. "[T]he deterrent effects of the *Bivens* remedy would be lost." *Id.* at 69 (quoting *FDIC v. Meyer*, 510 U.S. 471, 485 (1994)).

The same principle applies with equal force here. International criminal law is chiefly concerned with punishing those natural persons directly responsible for affronts to the law of nations. *See The Nürnberg (Nuremberg)*

*Trial* (*United States v. Goering*), 6 F.R.D. 69, 110 (Int'l Military Trib. 1946) ("Crimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced."). The complaint here amply demonstrates that if given the choice between pursuing a corporate defendant or the individuals responsible for violating international law, plaintiffs will choose the former. But, in the end, whether sound policy would counsel for or against extending ATS liability to corporations, the Supreme Court has clearly stated that such a policy determination is for Congress and not the courts. Under *Malesko* and *Jesner*, ATS liability does not attach to corporate defendants, and we should have corrected the panel majority's opposite conclusion en banc.

## II. Plaintiffs' Claims Are Impermissibly Extraterritorial.

In *Kiobel II*, the Court held "the presumption against extraterritoriality applies to claims under the ATS." 569 U.S. at 124. To sustain an ATS action, therefore, the allegations underlying the plaintiff's claim must "touch and concern the territory of the United States, [and] they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at 124–25. When we seek to apply the ATS to aiding-and-abetting claims, the locus of the actual law-of-nations violation becomes even more significant. *See Doe v. Drummond Co.*, 782 F.3d 576, 592–93 (11th Cir. 2015) (Where, as here, "the [ATS] claim is for secondary responsibility, we must . . . consider the location of any underlying conduct, such as where the actual injuries were inflicted.").

To determine whether a given "case involves a domestic application of the statute . . . [courts] look[] to the statute's 'focus.'" *RJR Nabisco v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* Put another way, if "all the relevant conduct occurred abroad, that is simply the end of the matter." *Mujica v. AirScan Inc.*, 771 F.3d 580, 594 (9th Cir. 2014) (quoting *Balintulo v. Daimler AG*, 727 F.3d 174, 190 (2d Cir. 2013)).

Because all relevant conduct took place abroad, we should have corrected the panel majority's decision to permit this case to proceed.

### A. Allegations of solely foreign misconduct cannot sustain an ATS claim.

Plaintiffs allege that they were victims of child slavery in Côte d'Ivoire. They allege that the perpetrators (who are not named defendants) are slavers and cocoa farmers abroad. They do not allege that any of the named defendants engaged in slavery or are associated with any of the actual perpetrators beyond their status as buyers of cocoa. "[T]he ATS's focus is . . . conduct that violates international law, which the ATS 'seeks to "regulate"' by giving federal courts jurisdiction over such claims." *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 197 (5th Cir.), cert. denied 138 S. Ct. 134 (2017) (quoting *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 267 (2010)); *see also Kiobel II*, 569 U.S. at 127 (Alito, J., concurring) ("[A] putative ATS cause of action will fall within the scope of the presumption against extraterritoriality—and will therefore be barred—unless the

domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations."). Here, that conduct—Plaintiffs' enslavement on cocoa plantations—took place abroad, and thus their ATS claims must be dismissed.

The majority opinion identifies three examples of conduct that, in its view, are sufficiently forceful to displace the presumption against extraterritoriality: allegations that 1) "[D]efendants funded child slavery practices in the Ivory Coast" in the form of "personal spending money to maintain the farmers' and/or the cooperatives' loyalty as an exclusive supplier," which the panel majority characterizes as "kickbacks"; 2) Defendants' employees "inspect operations in the Ivory Coast"; and 3) Defendants made "financing decisions" in the United States. *Nestle II*, 906 F.3d at 1126. The first two sets of allegations (provision of spending money and inspections) relate solely to foreign conduct. The third, which involves domestic corporate decision-making, cannot sustain an ATS claim, even if we assume aiding and abetting liability under the ATS.

Even if payments to cocoa farmers could be properly characterized as "kickbacks" (though they were never described in the complaint as such), the payments, like the slavery, all took place in Africa. The complaint does not even allege that the funds originated in the U.S., only that they were paid to "local farmers."[4] Alleged "inspections" of cocoa

---

[4] As to Defendant Nestle, the complaint does not even allege that any Nestle entity made any payments to any farmer that used child slaves, only that Nestle "was directly involved in the purchasing and processing of cocoa beans from Côte d'Ivoire." With respect to Defendant Cargill, the complaint alleges that "19 Malian child slaves were rescued" from one of

farms likewise took place in Africa. The panel majority fails to identify any domestic conduct alleged in the complaint that is "connect[ed] [to] the alleged international law violations." *Adhikari*, 845 F.3d at 198. Consistent with *Kiobel II*, alleged misconduct that took place entirely abroad cannot sustain an ATS claim.

## B. Domestic corporate presence cannot support an otherwise extraterritorial ATS claim.

The complaint does allege some domestic activity. Indeed, "it is a rare case . . . that lacks *all* contact with the territory of the United States." *Morrison*, 561 U.S. at 266. "But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* To the extent that the complaint alleges relevant domestic conduct at all, it simply alleges corporate presence and decision-making. That cannot form the basis for an ATS/aiding-and-abetting claim.

To begin, no court has held that the mere fact that a defendant is American is sufficient, on its own, to displace the presumption against extraterritoriality. At most, the domestic status of a corporation "may well be . . . *one* factor that, in conjunction with other factors," could establish a

---

the farms with which Cargill had an exclusive supplier relationship, but does not allege that Cargill had any relationship with the farm in question at a time it used slave labor, or that Cargill was specifically aware that the farm used slaves.

sufficient connection.[5] *Mujica*, 771 F.3d at 594 (emphasis added). But, as we explained, "the [Supreme] Court has repeatedly applied the presumption against extraterritoriality to bar suits" where the defendant was a U.S. corporation. *Id.* (compiling cases).

The panel majority concludes that Defendants making "financing decisions" in the United States is conduct sufficient to displace the presumption against extraterritoriality. But *Mujica* teaches us that vague allegations of domestic "decisions furthering the [] conspiracy" will not imbue an otherwise entirely foreign claim with the territorial connection that the ATS absolutely requires. 771 F.3d at 591; *see also Baloco v. Drummond Co.*, 767 F.3d 1229, 1236 (11th Cir. 2014) (presumption not displaced despite allegations of domestic decision-making).

Our holding here also conflicts with two other circuits that have considered the question. In *Doe v. Drummond*, the Eleventh Circuit held that the making of "funding and policy decisions in the United States" does not displace the presumption where the unlawful conduct itself took place in Colombia. 782 F.3d at 598; *see also Baloco*, 767 F.3d at 1236 (holding that domestic decision-making does not displace the presumption in the absence of allegations of "an express agreement between Defendants" and actual perpetrators of human rights abuses, which is not alleged here); *Cardona v.*

---

[5] The Second Circuit, though, views the citizenship of the defendant as an "irrelevant factual distinction[]" for purposes of the rule against extraterritoriality. *Balintulo*, 727 F.3d at 190; *see also Mastafa v. Chevron Corp.*, 770 F.3d 170, 189 (2d Cir. 2014) ("We disagree with the contention that a defendant's U.S. citizenship has any relevance to the jurisdictional analysis.").

*Chiquita Brands Int'l, Inc.*, 760 F.3d 1185, 1191 (11th Cir. 2014) (holding that ATS claim against domestic defendant must be dismissed because alleged acts of torture all took place abroad); *see also id*. at 1192 (Martin, J., dissenting) (faulting the majority for ordering dismissal notwithstanding allegations that domestic defendant "review[ed], approv[ed], and conceal[ed]" the scheme in the United States). And in *Adhikari*, the Fifth Circuit held that domestic payments from a U.S. corporation to a foreign subcontractor that was allegedly involved in "human trafficking" did not displace the presumption. 845 F.3d at 197.[6] Had Plaintiffs filed in the Fifth or Eleventh Circuit, their allegations would have been dismissed for want of adequate allegations of domestic conduct.

The only circuit court decisions that the panel majority identifies to support its view are both Second Circuit cases, *Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014), and *Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201 (2d Cir. 2016). *Mastafa* is clearly distinguishable. There, plaintiffs alleged "multiple domestic purchases and financing transactions" as well as "New York-based payments and 'financing arrangements' conducted exclusively through a New York bank account"—allegations of "specific and domestic" conduct altogether lacking here. 770 F.3d at 191. Indeed, *Mastafa* supports dismissal of the claims here, as the Second Circuit found the plaintiffs' allegations that "much of the decisionmaking to participate in the . . . scheme" took

---

[6] The fact that *Adhikari* involved a claim for primary, rather than secondary, liability is immaterial. Plaintiffs there sought to amend their complaint to add an aiding-and-abetting claim, and the Fifth Circuit held that such an amendment would be futile because the relevant facts alleged did not displace the presumption. 845 F.3d at 199.

place in the United States, "conclusory" and inadequate. 770 F.3d at 190.

*Licci* fares no better. The plaintiffs alleged that the defendant's domestic conduct "violated various terrorist financing and money laundering laws." 834 F.3d at 215. Plaintiffs here do not allege that Defendants made payments to Ivorian farmers to perpetuate law-of-nations violations, but rather to "maintain the farmers' . . . loyalty as an exclusive supplier." *Nestle II*, 906 F.3d at 1126. By permitting Plaintiffs' claims to go forward based on the allegations made here, we essentially read out the presumption against extraterritoriality.

Perhaps recognizing that the complaint alleges only normal business conduct in the United States, the panel majority asserts that Defendants paid "kickbacks" to the farmers in the form of "spending money" (though again, those payments were made in Africa, not the United States). Those "kickbacks,"[7] in the panel majority's view, are far more than normal corporate activity: Instead, Defendants are "maintain[ing] ongoing relations with the farms so that defendants could continue receiving cocoa at a price that would not be obtainable without employing child slave

---

[7] I understand "kickbacks" differently than the majority. For example, The Anti-Kickback Enforcement Act of 1986 essentially defines a kickback in the contract procurement sphere as providing money or something else of value (to a contractor, subcontractor, or employee of either) for the purpose of improperly obtaining or rewarding favorable treatment. *See* 41 U.S.C. § 8701(2). Providing a farmer money (even extra money) to keep supplying a product is not what I would ever have thought of as a kickback (versus bribing the farmer's plantation manager to steer business, for example).

labor." *Nestle II*, 906 F.3d at 1126. This somehow pushes the needle over the line.

But the complaint itself, which never uses the word "kickback," is devoid of any allegation that the provision of "spending money" was improper or illegal, and on the facts actually alleged, Plaintiffs could not plausibly make such an assertion.[8] The *factual* allegations in the complaint show only that Defendants sought to stabilize their supply lines and minimize costs by entering into exclusive-dealing arrangements. We have recognized that such agreements "provide 'well-recognized economic benefits.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 n.2 (9th Cir. 2016) (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)). Indeed, the complaint merely alleges that "spending money" is meant to "maintain the farmers' and/or the cooperatives' loyalty as exclusive suppliers." Because the complaint lacks an allegation that Defendants provided anything to the farmers for an illegal purpose, the panel majority was flatly wrong to "infer" "kickbacks" from the facts alleged.

The complaint here alleges clear, egregious, and terrible violations of Plaintiffs' basic human rights. But the allegations are equally clear that all the relevant misconduct took place in Côte d'Ivoire, not the United States. The panel majority's conclusion to the contrary is based on a reconstruction and/or rewriting of the allegations in the complaint in a way that essentially eliminates the presumption against extraterritoriality. But, no matter how the

---

[8] Tellingly, Plaintiffs' response to the rehearing petitions does not defend the panel majority's use of the "kickback" label, except to repeat that "all reasonable inferences are made in Plaintiffs' favor."

complaint is viewed, it still alleges horrific conduct that took place *outside* the United States.**⁹**

### III.    Conclusion.

The Supreme Court directs us to proceed cautiously when interpreting the ATS. Instead, we have adopted a broad and expansive view of the statute that largely disregards recent Supreme Court precedent. I thus respectfully dissent from our decision not to rehear this case en banc.

---

**⁹** The panel majority also erred in allowing Plaintiffs the opportunity to file yet another complaint in this action, which has been pending for almost fifteen years—it will make their *fourth* overall. Rather than address the complaint's obvious pleading deficiencies, the panel majority asserts that "*Jesner* changed the legal landscape on which plaintiffs constructed their case," and as a result, Plaintiffs must be allowed to "amend their complaint to specify whether aiding and abetting conduct that took place in the United States is attributable to the domestic corporations in this case." *Nestle II*, 906 F.3d at 1126–27.

Plaintiffs already had the opportunity to replead to allege domestic aiding and abetting after *Kiobel II*. *See Nestle I*, 766 F.3d at 1028. Rather than doing so, Plaintiffs lumped together foreign and domestic entities in their complaint, *see Nestle II*, 906 F.3d at 1126, muddying, rather than clearing up, questions surrounding the locus of the tortious conduct alleged. Nothing in *Jesner* changes the requirement that domestic conduct sufficient to displace the presumption against extraterritoriality is required and *Jesner* is no reason to allow yet another amendment to Plaintiffs' complaint as the total unallocated domestic conduct alleged here is clearly insufficient.

## OPINION

D.W. NELSON, Circuit Judge:

### *OVERVIEW*

Plaintiffs-Appellants ("Plaintiffs"), former child slaves who were forced to work on cocoa farms in the Ivory Coast, filed a class action lawsuit against Defendants-Appellees Nestle, SA, Nestle USA, Nestle Ivory Coast, Archer Daniels Midland Co. ("ADM"),[1] Cargill Incorporated Company, and Cargill West Africa, SA ("Defendants"). In their Second Amended Complaint, plaintiffs alleged claims for aiding and abetting slave labor that took place in the United States under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). The district court dismissed the claims below based on its conclusion that plaintiffs sought an impermissible extraterritorial application of the ATS. We reverse and remand. In light of an intervening change in controlling law, we think it unnecessary to consider the other issues this case presents at this juncture.

### *BACKGROUND*

## I. Factual Background

We discussed much of the factual background of this case in *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014) ("*Nestle I*"). Child slavery on cocoa farms in the Ivory Coast, where seventy percent of the world's cocoa is produced, is a pervasive humanitarian tragedy.

---

[1] Plaintiffs voluntarily dismissed ADM from this case.

Plaintiffs are former child slaves who were kidnapped and forced to work on cocoa farms in the Ivory Coast for up to fourteen hours a day without pay.  While being forced to work on the cocoa farms, plaintiffs witnessed the beating and torture of other child slaves who attempted to escape.

Defendants are large manufacturers, purchasers, processors, and retail sellers of cocoa beans.  Several of them are foreign corporations that are not subject to suit under the ATS. *Jesner v. Arab Bank*, 138 S. Ct. 1386, 1407 (2018). The effect of *Jesner* in tandem with plaintiffs' habit of describing defendants en masse presents a challenge we address below.  For now, we describe the case as plaintiffs present it.  We take their plausible allegations as true and draw all reasonable inferences in their favor. *See Nestle I*, 766 F.3d at 1018.

Because of their economic leverage over the cocoa market, defendants effectively control cocoa production in the Ivory Coast.  Defendant Nestle, USA is headquartered in Virginia and coordinates the major operations of its parent corporation, Nestle, SA, selling Nestle-brand products in the United States.  Every major operational decision regarding Nestle's United States market is made in or approved in the United States.  Defendant Cargill, Inc. is headquartered in Minneapolis.  The business is centralized in Minneapolis and decisions about buying and selling commodities are made at its Minneapolis headquarters.

Defendants operate with the unilateral goal of finding the cheapest source of cocoa in the Ivory Coast.  Not content to rely on market forces to keep costs low, defendants have taken steps to perpetuate a system built on child slavery to depress labor costs.  To maintain their supply of cocoa,

defendants have exclusive buyer/seller relationships with Ivory Coast farmers, and provide those farmers with financial support, such as advance payments and personal spending money. 19 Malian child slaves were rescued from a farm with whom Cargill has an exclusive buyer/seller relationship. Defendants also provide tools, equipment, and technical support to farmers, including training in farming techniques and farm maintenance. In connection with providing this training and support, defendants visit their supplier farms several times per year.

Defendants were well aware that child slave labor is a pervasive problem in the Ivory Coast. Nonetheless, defendants continued to provide financial support and technical farming aid, even though they knew their acts would assist farmers who were using forced child labor, and knew their assistance would facilitate child slavery. Indeed, the gravamen of the complaint is that defendants depended on—and orchestrated—a slave-based supply chain.

## II. Procedural History

Plaintiffs began this lawsuit over a decade ago, and we had occasion to consider it once before in *Nestle I*. On remand after *Nestle I*, defendants moved to dismiss the operative complaint and the district court granted the motion. In its order, the district concluded that the complaint seeks an impermissible extraterritorial application of the ATS because defendants engaged domestically only in ordinary business conduct. The district court did not decide whether plaintiffs stated a claim for aiding and abetting child slavery.

Plaintiffs timely appealed.

## STANDARD OF REVIEW

We review a dismissal for lack of jurisdiction de novo. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 (9th Cir. 2007) (citing *Arakaki v. Lingie*, 477 F.3d 1048, 1056 (9th Cir. 2007)). "A dismissal for failure to state a claim is reviewed de novo. All factual allegations in the complaint are accepted as true, and the pleadings construed in the light most favorable to the nonmoving party." *Nestle I*, 766 F.3d at 1018 (quoting *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 737 (9th Cir. 2008) (internal citations omitted)).

## DISCUSSION

The legal landscape has shifted since we last considered this case, including during the pendency of this appeal. The Supreme Court's decisions in *Jesner* and *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), require us to revisit parts of *Nestle I*.

## I.   Corporate Liability Post-*Jesner*

In *Nestle I*, we held that corporations are liable for aiding and abetting slavery after applying three principles from our en banc decision in *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 746 (9th Cir. 2011) (en banc), *vacated on other grounds by Rio Tinto PLC v. Sarei*, 133 S. Ct. 1995 (2013). *Nestle I*, 766 F.3d at 1022. Our court in *Sarei* adopted a norm-specific analysis that determines "'whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued.'" *Sarei*, 671 F.3d at 760 (quoting *Sosa*, 542 U.S. at 732 n.20). "First, the analysis proceeds norm-by-norm; there is no categorical rule of corporate immunity or liability." *Nestle I*, 766 F.3d at 1022 (citing

*Sarei*, 671 F.3d at 747–48).   Under the second principle, "corporate liability under an ATS claim does not depend on the existence of international precedent enforcing legal norms against corporations." *Id.* (citing *Sarei*, 671 F.3d at 760–61). "Third, norms that are 'universal and absolute,' or applicable to 'all actors,' can provide the basis for an ATS claim against a corporation." *Id.* (citing *Sarei*, 671 F.3d at 764–65).   We reaffirmed these principles in *Nestle I* and held that since the prohibition of slavery is "universal," it is applicable to all actors, including corporations.  *Id.* at 1022.

As we have noted, the Supreme Court in *Jesner* held that foreign corporations cannot be sued under the ATS.  *Jesner*, 138 S. Ct. at 1407.  *Jesner* thus abrogates *Nestle I* insofar as it applies to foreign corporations.   But *Jesner* did not eliminate all corporate liability under the ATS, and we therefore continue to follow *Nestle I*'s holding as applied to domestic corporations.  *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

## II.  Extraterritorial ATS Claim

In *Kiobel v. Royal Dutch Petroleum Co. (Kiobel II)*, the Supreme Court held that the ATS does not have extraterritorial reach after applying a canon of statutory interpretation known as the presumption against extraterritorial application, which counsels that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  569 U.S. 108, 115 (2013) (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 248 (2010)).   The Court acknowledged that the canon is not directly on point given that the ATS "does not directly regulate conduct or afford relief."  *Id.*  But given the foreign policy concerns the ATS poses, the Court stated that "the

principles underlying the canon of interpretation similarly constrain courts considering causes of action that may be brought under the ATS." *Id.*

The Court in *Kiobel II* left the door open to the extraterritorial application of the ATS for claims made under the statute which "touch and concern the territory of the United States . . . with sufficient force to displace the presumption." *Id.* at 123 (citing *Morrison*, 561 U.S. at 264–73). Because "all the relevant conduct" in *Kiobel II* took place abroad, the Court did not need to delve into the contours of the touch and concern test. *Id.* The only guidance the Court provided about the "touch and concern" test was that "mere corporate presence" would not suffice to meet it. *Id.*

In announcing the "touch and concern" test, the Supreme Court cited to its decision in *Morrison v. National Australia Bank Lt*. In *Morrison*, the Supreme Court undertook a two-step analysis, known as the "focus" test, to determine whether Section 10(b) of the Securities Exchange Act of 1934 applies extraterritorially. *Morrison*, 561 U.S. at 262. Under the first analytical step, the Court asked if there is any indication that the statute is meant to apply extraterritorially, and concluded there is not. *Id.* at 265. Under the second step, the Court asked what the "'focus' of congressional concern" was in passing Section 10(b). *Id.* The Court found that the "focus is not on the place where the deception originated, but on purchases and sales of securities in the United States. Section 10(b) [therefore] applies only to transactions in securities listed on domestic exchanges and domestic transactions in other securities." *Id.* at 249.

In the first appeal of this case, we reasoned that "*Morrison* may be informative precedent for discerning the content of the touch and concern standard, but the opinion in *Kiobel II* did not incorporate *Morrison's* focus test. *Kiobel II* did not explicitly adopt *Morrison's* focus test, and chose to use the phrase 'touch and concern' rather than the term 'focus' when articulating the legal standard it did adopt." *Nestle I*, 766 F.3d at 1028.

Defendants argue that the Supreme Court's recent decision in *RJR Nabisco* requires us to apply the focus test to claims under the ATS. In *RJR Nabisco*, the Court applied the *Morrison* focus test to the Racketeer Influenced and Corrupt Organizations Act ("RICO") and reiterated that *Morrison* reflects a two-step inquiry regarding extraterritoriality. *Id.* at 2103. The Court further stated that "*Morrison* and *Kiobel* [also] reflect a two-step framework for analyzing extraterritoriality issues." *Id.* at 2101.

Because *RJR Nabisco* has indicated that the two-step framework is required in the context of ATS claims, we apply it here. *See Miller v. Gammie*, 335 F.3d at 893. First, we determine "whether the [ATS] gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*, 136 S. Ct. at 2101. The Court in *Kiobel II* already answered that the "presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption." *Kiobel II*, 569 U.S. at 185.

Because the ATS is not extraterritorial, then at the second step, we must ask whether this case involves "a domestic application of the statute, by looking to the statute's 'focus.'" *RJR Nabisco*, 136 S. Ct. at 2101. Defendants insist that any acts of assistance that took place in the United States are

irrelevant because the extraterritoriality analysis should focus on the location where the principal offense took place or the location the injury occurred, rather than the location where the alleged aiding and abetting took place. We disagree.

The focus of the ATS is not limited to principal offenses. In *Mastafa v. Chevron Corp.*, the Second Circuit held that "the 'focus' of the ATS is on . . . conduct of the defendant which is alleged by plaintiff to be either a direct violation of the law of nations or . . . *conduct that constitutes aiding and abetting* another's violation of the law of nations." 770 F.3d at 185 (emphasis added); *see also Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 199 (5th Cir. 2017) (stating that aiding and abetting conduct comes within the focus of the ATS). We also hold that aiding and abetting comes within the ATS's focus on "tort[s] . . . committed in violation of the law of nations." 28 U.S.C. § 1350.

As part of the step two analysis, we then determine "whether there is any domestic conduct relevant to plaintiffs' claims under the ATS." *Adhikari*, 845 F.3d at 195. Under *RJR Nabisco*, "if the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application *even if other conduct occurred abroad*." *RJR Nabisco*, 136 S. Ct. at 2101 (emphasis added).

In *Mastafa*, the Second Circuit held that the following constituted "specific, domestic conduct": "Chevron's [Iraqi] oil purchases, financing of [Iraqi] oil purchases, and delivery of oil to another U.S. company, all within the United States, as well as the use of a New York escrow account and New York-based 'financing arrangements' to systematically enable illicit payments to the Saddam Hussein regime that allegedly

facilitated that regime's violations of the law of nations." *Mastafa*, 770 F.3d at 195.

In *Licci by Licci v. Lebanese Canadian Bank, SAL*, the Second Circuit again held that the Lebanese Canadian Bank's ("LCB") "provision of wire transfers between Hezbollah accounts" through a United States bank constituted domestic conduct which rebutted the presumption against extraterritoriality. 834 F.3d 201, 214–15, 219 (2d Cir. 2016). There, LCB made "numerous New York-based payments and 'financing arrangements' conducted exclusively through a New York bank account." *Id.* at 217 (citing *Mastafa*, 700 F.3d at 191).

Like in *Mastafa* and *Licci*, plaintiffs have alleged that defendants funded child slavery practices in the Ivory Coast. Specifically, plaintiffs allege that defendants provided "personal spending money to maintain the farmers' and/or the cooperatives' loyalty as an exclusive supplier." Because we are required to "draw all reasonable inferences in favor" of plaintiffs, *Mujica v. Airscan*, Inc., 771 F.3d 580, 589 (9th Cir. 2014), we infer that the personal spending money was outside the ordinary business contract and given with the purpose to maintain ongoing relations with the farms so that defendants could continue receiving cocoa at a price that would not be obtainable without employing child slave labor. Contrary to the district court's reasoning, providing personal spending money to maintain relationship above the contract price for cocoa is not ordinary business conduct, and is more akin to "kickbacks." *Mastafa*, 770 F.3d at 175. Defendants also had employees from their United States headquarters regularly inspect operations in the Ivory Coast and report back to the United States offices, where these financing decisions, or "financing arrangements," originated. *Licci by*

*Licci*, 834 F.3d at 217 (citing *Mastafa*, 770 F.3d at 191). In sum, the allegations paint a picture of overseas slave labor that defendants perpetuated from headquarters in the United States. "This particular combination of conduct in the United States . . . is both specific and domestic." *Id.* at 191. We thus hold that foregoing narrow set of domestic conduct is relevant to the ATS's focus.

## III.    Aiding And Abetting Claim

Defendants invite us to rule in the alternative that plaintiffs have not sufficiently alleged the elements of aiding and abetting. We think it unnecessary to reach that issue at this time. As we have explained, *Jesner* changed the legal landscape on which plaintiffs constructed their case. The operative complaint names several foreign corporations as defendants, and plaintiffs concede those defendants must be dismissed on remand. The operative complaint also discusses defendants as if they are a single bloc—a problematic approach that plaintiffs would do well to avoid. In light of *Jesner*, it is not possible on the current record to connect culpable conduct to defendants that may be sued under the ATS.

As we observed in *Nestle I*, "[i]t is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law, unless it is clear that amendment would be futile." *See Nestle I*, 766 F.3d at 1028 (citations omitted). We are mindful that this case has lingered for over a decade, and that delay does not serve the interests of any party. But we cannot conclude that amendment would be futile, so we remand with instructions that plaintiffs be given an opportunity to amend their complaint. On remand, plaintiffs must remove those defendants who are no longer amenable

to suit under the ATS, and specify which potentially liable party is responsible for what culpable conduct.

## IV.    Plaintiffs Have Standing to Bring Their Claims

Defendants argue that plaintiffs lack Article III standing to bring their claims. To have standing, plaintiffs must allege "[(1)] a concrete and particularized injury [(2)] that is fairly traceable to the challenged conduct, [(3)] and is likely to be redressed by a favorable judicial decision." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1187 (9th Cir. 2016), cert. denied, (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)).

Plaintiffs easily satisfy the first and third requirements. Defendants do not dispute that plaintiffs suffered concrete injury by being abused and held as child slaves. In addition, plaintiffs' injuries are redressable because when "one private party is injured by another, the injury can be redressed in at least two ways: by awarding compensatory damages or by imposing a sanction on the wrongdoer that will minimize the risk that the harm-causing conduct will be repeated." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 127 (1998).

Plaintiffs also satisfy the traceability requirement as to Cargill because they raise sufficiently specific allegations regarding Cargill's involvement in farms that rely on child slavery. *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1343 (11th Cir. 2011); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (Article III traceability requirement "does not exclude injury produced by determinative or coercive effect upon the action of someone else."). Plaintiffs' allegations against Nestle are far less clear, though part of the difficulty is plaintiffs' reliance on collective allegations against all or at

least multiple defendants.  Notwithstanding this deficiency, the allegations are sufficient to at least allow plaintiffs a final opportunity to replead. On remand, plaintiffs must eliminate the allegations against foreign defendants and specifically identify the culpable conduct attributable to individual domestic defendants.

## *CONCLUSION*

For the reasons set forth above, we **REVERSE** the district court and **REMAND** to allow plaintiffs to amend their complaint to specify whether aiding and abetting conduct that took place in the United States is attributable to the domestic corporations in this case.

SHEA, District Judge:

I concur in the result.